### ADOPTION OF WILLOW & others.[1]

Barnstable. January 11, 2001. - April 6, 2001.

Present: MARSHALL, C.J., GREANEY, SPINA, COWIN, & SOSMAN, JJ.

*Parent and Child,* Dispensing with parent's consent to adoption, Care and protection of minor. *Adoption,* Dispensing with parent's consent, Care and protection. *Minor,* Care and protection, Custody.

This court concluded that nothing in G. L. c. 119, the care and protection statute, or in G. L. c. 210, the adoption statute, precluded a Juvenile Court judge from terminating a mother's parental rights, but not the father's, upon appropriate findings, in circumstances in which the mother was unfit and the children were in immediate danger, the parents were divorced and there remained a possibility that the children might be placed in the custody of the father, and there was insufficient evidence to support a finding that it was in the children's best interests to terminate the father's parental rights. [642-650]
No constitutional rights of a mother were infringed by the termination of her parental rights based on overwhelming evidence of her unfitness and of the best interests of the three children. [650-651]
An issue not raised at trial was waived for purposes of appeal. [651-652]
Evidence in a proceeding to dispense with a mother's consent to adoption was sufficient to support the termination of the mother's parental rights. [652-653]

PETITIONS filed in the Orleans Division of the Juvenile Court Department on February 5, 1997.

The cases were heard by *Robert C. Campion,* J.

The Supreme Judicial Court granted an application for direct appellate review.

*David A.F. Lewis* for the mother.

*Virginia A. Peel,* Special Assistant Attorney General (*Christopher E. Lee,* Assistant General Counsel, with her) for the Department of Social Services.

*Susan F. Drogin* for the children.

---

[1]Her sister, Nancy, and her brother, Gregory. The names are pseudonyms. We acknowledge an amicus brief filed by the Committee for Public Counsel Services.

*Deborah D. Wolf,* for the father, was present but did not argue.

*Margaret Clapp & Juliette Hall* for Committee for Public Counsel Services, amicus curiae, submitted a brief.

MARSHALL, C.J. This appeal arises from petitions of the Department of Social Services (department) to dispense with the need for a mother's and a father's consent to the adoption of their three children. G. L. c. 210, § 3. The mother, a resident of Massachusetts, is divorced from the children's father, who resides in Oklahoma with his current wife. A judge in the Juvenile Court allowed the department's petition with respect to the mother only. He found that the father was currently unfit to assume his parental responsibility and likely to remain so indefinitely, but denied the petition as to the father because of insufficient evidence.

The mother brought this appeal.[2] She challenges on statutory and constitutional grounds the termination of her parental rights where the judge did not simultaneously terminate the parental rights of the father. The mother also maintains that the judge did not make adequate findings of fact concerning the effects of a geographic separation of the three siblings. We granted the mother's application for direct appellate review. We affirm the decrees.

I

A

On February 5, 1997, the department filed care and protection petitions on behalf of three children, Nancy (born June 25, 1987), Willow (born December 10, 1989), and Gregory (born June 9, 1991). The department received temporary custody of all three children, who were living at the time with their mother on Cape Cod. See G. L. c. 119, § 24. On November 24, 1997,

---

[2]On appeal, the mother does not challenge the termination order with respect to her oldest child, Nancy, now thirteen years old. The mother, the father, and the Department of Social Services (department) all agree that Nancy should remain with, and be adopted by, her current foster family. The judge made a finding to that effect. Following the trial, the father voluntarily relinquished his parental rights with respect to Nancy.

the mother agreed that the children should be placed in the permanent custody of the department. The whereabouts of the children's father were unknown to the department at that time. On July 27, 1998, a judge in the Juvenile Court allowed the department's motion to amend its pleadings in order to dispense with the mother's and the father's consent to the adoption of the three children.

Over the course of these proceedings, the department established a series of service plans, each of which identified separate goals for the mother, the children and, once he was located, the father. Prior to the removal of the children from her care, the goal for the mother was to "stabilize" the family. In May, 1997, the goal was to "reunify" the children with her, but in every subsequent plan the goal was "adoption."

In September, 1998, an attorney for the father notified the court that the father had been located and was living in Oklahoma. In October, 1998, the father appeared in court for the first time and expressed his desire to regain custody of his children. In view of his late appearance in the case, a judge ordered that previously filed court investigative reports be updated so that information concerning the father could be obtained. The goal of the department's first and only service plan for the father, covering the period April 30, 1999, through October 31, 1999, was to "[r]eunify [f]amily" with the children. To that end, in April, 1999, the department initiated an interstate home study to determine whether the father could properly care for his children in Oklahoma.[3] On August 6, 1999, shortly before the trial commenced, the department was informed by the Oklahoma Department of Human Services that it did not recommend that the children be placed with their father. The Oklahoma social worker who conducted the evaluation

---

[3]The Interstate Compact on the Placement of Children provides that the department may not send children in its custody to another State until the appropriate public authorities in the receiving State notify the department in writing that the proposed placement does not appear to be contrary to the interests of children. See St. 1963, c. 452, § 1. An interstate home study conducted pursuant to that provision involves interviews with the potential caretakers, reference checks, criminal record checks, and a physical inspection of the home. The department's regulations provide that the provisions of the interstate compact apply to the placements of children in State custody with their parents in another State. 110 Code Mass. Regs. § 7.507 (4) (1993).

expressed concerns that the father, a victim of sexual abuse and a substance abuser, did not have the ability to meet the needs of the children, particularly as there were few resources available to the father in his rural community to assist him.

By August, 1999, when a three-day trial on the department's petitions was conducted before a judge in the Juvenile Court, the department's goal for all three children was adoption. See Part II, *infra*. The department introduced in evidence its plans to recruit adoptive resources actively and to identify prospective adoptive families for the two younger children, Willow and Gregory. Its plan for Nancy, the oldest child, was adoption by her current foster family. The father testified that he sought custody of Willow and Gregory, but agreed to consent to Nancy's adoption by her foster mother. See note 2, *supra*.

On September 10, 1999, before the judge issued his decision, the department filed permanency plans providing for placement for adoption of all three children. See G. L. c. 119, § 29B.[4] Neither parent filed an objection, and the plans were approved by a judge on October 20, 1999.

On December 31, 1999, the trial judge filed extensive findings of fact and conclusions of law. He determined that both the mother and the father were currently unfit to assume parental responsibility for the children, and that the unfitness of each "is likely to continue into the indefinite future to a near certitude." He further concluded that it was in the best interests of all three children to terminate the mother's parental rights, but that there was not sufficient evidence to terminate the father's parental

---

[4]General Laws c. 119, § 29B, first par., as appearing in St. 1999, c. 3, § 12, provides in pertinent part: "Except as provided herein, within 12 months of the original commitment, grant of custody or transfer of responsibility of a child to the department by a court of competent jurisdiction, and not less frequently than every 12 months thereafter while the child remains in the care of the department, the committing court shall conduct a permanency hearing, in accordance with rules established by the chief justice for administration and management, to determine and periodically review thereafter the permanency plan for the child. The plan shall address whether and, if applicable, when (1) the child will be returned to the parent; (2) the child will be placed for adoption and the steps the department shall take to free the child for adoption; (3) the child will be referred for legal guardianship; or (4) the child will be placed in another planned permanent living arrangement. The department shall file a permanency plan prior to a permanency hearing which shall address the above placement alternatives."

rights. See G. L. c. 210, § 3 (c) (Supp. 1999). The judge adjudicated the children in need of care and protection, G. L. c. 119, and ordered that they be committed to the custody of the department "until they reach the age of eighteen (18) years or until, in the opinion of the Department, the goal of their commitment has been accomplished." The judge dispensed with the need for the mother's consent to any legal proceeding affecting the custody, guardianship, adoption, or other disposition of the children. G. L. c. 119, § 26 (4). The judge also determined that Nancy's best interests would be served if she were to remain in her current foster placement.

## B

The mother does not challenge any of the judge's comprehensive findings of fact, including his finding that she is unfit to parent her children. Other than her argument concerning the judge's decision not to terminate the father's rights at the same time, she does not dispute the judge's finding that it is in the best interests of the children to terminate her parental rights. We summarize the findings in some detail, as they help to illustrate our discussion of her legal claims.

The trial evidence focused on the severe abuse and neglect suffered by the three children before they were placed in the department's care. The mother, who had custody of the children,[5] moved with them from Arizona to Cape Cod in August, 1995. Shortly afterward, she began living with a male companion. When the companion was evicted from his apartment, the mother and children moved with him into a succession of motel rooms, from which they were also evicted. The mother, her companion, and the three children then lived in his "antique store," where the living conditions were deplorable, with no heat or running water.

The mother's companion subjected all three children to repeated and brutal physical abuse, including beating them with a baseball bat, and punching and kicking them in the face. Two examples will suffice. The companion taped Gregory's arms behind his back, taped his mouth shut, and glued his eyes shut

---

[5]As part of the 1993 final divorce judgment from the father, the mother received custody of the children, the father visitation rights.

with fingernail polish. On another occasion, he placed Gregory in a tub of cold water for more than two hours, then poured ammonia over him, placed him on a stool where he fell asleep, and did nothing to protect him as he fell off the stool and hit his head.

There was substantial evidence that the mother neglected her children. She was aware of the scope and duration of the abuse being inflicted by her companion, but neither protected her children nor sought medical treatment when it was necessary.[6] The children wore dirty clothes, and their teeth were in "dreadful condition." The mother seemed unconcerned that Nancy and Willow missed many days of school. Gregory could not attend kindergarten because she failed to have him immunized. When first placed in foster care, they ate ravenously with their hands and hoarded food.

Each of the children suffers from posttraumatic stress disorder as a result of their prolonged exposure to neglect and emotional and physical abuse. The judge found that the children displayed other symptoms of serious deprivation, and suffer in varying degrees from a variety of psychological disorders including low self-esteem, depression, emotional numbing, and inability to sleep. All three receive therapy on a weekly basis and will need therapy for an extended period.

The judge also found that the mother failed to avail herself of a range of therapeutic programs offered to her by the department, including drug and alcohol abuse treatment programs, parenting skills programs, individual and couple's therapy, battered women's treatment programs, and domestic violence programs. After the children were removed from her care, she did not visit them for eight months, and the judge found that she recognized little responsibility for their plight. In February, 1998, the mother ended her relationship with the companion. Shortly afterward she began living with another man, who also has a history of violent behavior, including abuse of children.

---

[6]There was evidence that the mother had no financial resources when she returned to Massachusetts in 1995, that she has been a repeated victim of domestic violence, and that she has many of the symptoms of severely battered women. Despite her neglect of her children and her failure to protect them from abuse, there was evidence that she was concerned about their welfare and wanted "very much" to be reunited with them.

She was living with him at the time of trial, and testified that she would bring the children to live with him if they were returned to her custody. On the basis of this compelling evidence, the judge determined that the children would be at risk of a substantial danger of abuse if they were returned to the mother's custody.

The judge also made careful findings of fact concerning the father. In 1993, the father moved from Arizona to Oklahoma and subsequently was divorced from the children's mother. He remarried there in 1995. As of 1999, the father was employed full-time and living with his new wife and their daughter in appropriate housing.

For years, the father had no contact with his children. He became aware that his children were in foster care in Massachusetts when his brother informed him that he had by chance met one of the children in a Massachusetts restaurant. The judge found that the father, with little effort, could have learned of his children's difficulties. The father returned to Massachusetts and appeared in court in October, 1998. He later "reintroduced" himself to his children by writing to them and visiting them on two occasions under the department's supervision. The father was a victim of sexual abuse as a child. The judge found that he had not adequately addressed his history through treatment. He also has a long history of substance abuse and a criminal record, related mostly to drug activity. The judge nevertheless determined that by 1999 the father had "brought some stability to his life."

II

The mother challenges on statutory and constitutional grounds the authority of the judge to terminate her parental rights where the judge did not simultaneously terminate the parental rights of the biological father. We consider her statutory challenges first.[7]

_____

[7] The department, the father, and the children each argue that the mother waived her statutory claims because she did not raise them in the Juvenile Court. As a general matter, "issues not raised by a losing party in the trial court are not addressed on appeal, absent exceptional circumstances." *Adoption of Mary*, 414 Mass. 705, 712 (1993), citing *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption*, 392 Mass. 696, 697 (1984). In

The essence of her argument is that the judge was without authority under either the care and protection statute, G. L. c. 119, or the adoption statute, G. L. c. 210, to terminate only one parent's rights. There was no plan for an adoption for the two younger children, Willow and Gregory, she argues. Rather, the department's plan was reunification with their father. In such circumstances, she claims, proceeding with termination violated the legislative policies of the Commonwealth not to sever family ties where placement of a child with a family member is a viable option.

We address preliminarily the mother's claim that the department "misrepresented" that its goal was the adoption of Willow and Gregory, that the real goal for them was reunification with their father, and that the judge was "well aware" of that goal. The record does not support her claims. The service plans for Willow and Gregory identified adoption as the goal. On the other hand, a department social worker testified that the department's goal for the father was reunification and that it was "possible" for the department to continue working with him and to consider placement of Willow and Gregory with him in the future. Questioned by the judge, the social worker clarified the relationship of the different plans: the service plan for the father was in place "in case [the adoption] does not go through." He further explained that following the father's "renewed involvement" and "since his petition for full custody, we have to maintain a goal to reunify the family until we've proven otherwise."

When the father finally appeared, it was appropriate for the department to explore whether he could assume custody of his children. See 110 Code Mass. Regs. § 1.02 (1993) (department shall direct its efforts toward reunification of children with their parent). But because it was unclear, at best, whether the father was capable of doing so, the department appropriately continued to move forward with the adoption plans by attempting to

this case, the mother was aware at trial that the department was exploring the possibility of "reunifying" the two younger children with their father, but she did not know until the judge issued his findings of fact five months later that the judge would terminate only her parental rights. Additionally, the propriety of the judge's "split termination order" presents a novel issue of law sufficient to merit our consideration of her claims. See *Adoption of Mary, supra.*

"concurrently identify, recruit, process and approve . . . qualified famil[ies] for adoption" of the children. G. L. c. 119, § 26 (4). G. L. c. 210, § 3 (*b*). The judge was informed of the interstate compact report recommending against placement of the children with their father in Oklahoma. In light of that report, the department was prohibited at that time from placing the children with their father. See St. 1963, c. 452, § 1, art. III (*d*) (child shall not be sent to receiving State until it notifies sending State that proposed placement is not contrary to child's best interests). See also *Adoption of Warren*, 44 Mass. App. Ct. 620, 624 (1998). The judge was fully warranted in proceeding with the termination proceeding.[8]

Turning now to the statutory claims, we conclude that the decree in this case terminating only the mother's parental rights is not precluded by and is consistent with the core purpose of the care and protection statute, G. L. c. 119, and the adoption statute, G. L. c. 210: the advancement of the best interests of the children. See *Adoption of Tammy*, 416 Mass. 205, 210 (1993), and cases cited. See also G. L. c. 119, § 1 (purpose of statute is to ensure that children are "protected against the harmful effects resulting from the absence, inability, inadequacy or destructive behavior of parents" and to assure good substitute parental care in the event of the inability or unfitness of parents "to provide care and protection for their children"). The Legislature has mandated that a judge may not terminate parental rights unless there is a finding that a parent is currently unfit and that the termination of those rights would be in the child's best interests. G. L. c. 210, § 3. The "focus of [a termination] proceeding is not whether the parent should be deprived of 'custody' in order to safeguard the child's well-

---

[8]We are informed by counsel for the children that some months after the trial, the department removed Willow and Gregory from their respective foster homes in Massachusetts and sent them to live with their father in Oklahoma. The judge, of course, did not have such evidence before him. We address the propriety of the judge's orders based on the evidence introduced at trial, and not on posttrial events. See *Adoption of Inez*, 428 Mass. 717, 721-722 (1999) (posttrial affidavits supporting mother's parental fitness not properly admitted for consideration before Appeals Court). To take into account information concerning posttrial events would diminish finality and efficiency, interests that are important in these proceedings. See *id.* at 722, citing *Adoption of Galen*, 425 Mass. 201, 206 (1997).

being, but rather whether 'it would be in the best interests of the child for all legal relations [with the parent] to be ended.' " *Adoption of Helen*, 429 Mass. 856, 863 (1999), quoting *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption*, 392 Mass. 738, 741 (1984). See *Adoption of Carlos*, 413 Mass. 339, 350 (1992).

The judge complied with the statutory mandate in all respects. He found the mother unfit and terminated her parental rights based on overwhelming evidence that it was in the best interests of the children to do so: the mother severely neglected her children, and failed to protect them from unconscionable abuse inflicted on them by her companion. She failed to maintain significant and meaningful contact with them when they were placed in the department's care, failed to utilize services offered by the department, and failed to accept responsibility for the trauma the children had suffered. The mother has not been able to deal with her long history of domestic violence from various abusive partners. At the time of trial, she had entered into another abusive relationship and the judge found that the children would be at considerable risk from that relationship. The judge pointed to the fact that he sought not to punish the mother but to protect her endangered children. See *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. 573, 591-592 (1981). He drew attention to the positive development of the children since they had been removed from the mother's care, and the profound risk to them if they are returned to her care.

We do not agree with the mother that the legislative scheme authorizes only an order terminating the parental rights of both parents. General Laws c. 119, § 26, and G. L. c. 210, § 3, have recently been amended to extend a judge's authority to enter an order dispensing with the need for a parent's consent not only to a child's adoption, but to any legal proceeding affecting a child's custody, guardianship or other disposition. St. 1999, c. 6. St. 1998, c. 14. Prior to April, 1998, an order allowing a petition of the department such as the one at issue here terminated a parent's right of consent only with respect to the adoption of the child. G. L. c. 119, § 26 (4), as amended through St. 1997, c. 43, § 99. If, during the course of or after a trial to dispense

with consent to adoption, the department's plan for a child changed from adoption, the department was required to file a separate petition. See *Adoption of Reid*, 39 Mass. App. Ct. 338, 343 (1995) (separate petition required where department's goal changed from adoption to guardianship). As amended in 1998, G. L. c. 119, § 26 (4), and G. L. c. 210, § 3 (*b*), now provide that:

> "The entry of [an order to dispense with the need for consent of any person named in c. 210, § 2, to the adoption of a child] shall have the effect of terminating the rights of *a person* named [in the petition] to receive notice of or to consent to *any legal proceeding affecting the custody, guardianship, adoption or other disposition* of the child named [in the petition]" (emphasis added).

St. 1998, c. 14.[9] The amended statute thus provides a greater range of permanent placement options — custody, adoption, or other disposition — for children, and the department is no longer required to retry a parent's unfitness in the event a proposed plan for the child changes either during or after trial. G. L. c. 210, § 3. G. L. c. 119, § 26 (4).

In 1999, the Legislature further amended G. L. c. 119, § 26 (4), to provide:

> "[A judge] may enter an order to dispense with the need for consent of *any person* named in [§ ] 2 of [c.] 210, to the adoption, custody, guardianship or other disposition of the child . . . upon a finding that the child is in need of care and protection pursuant to [§ 26] and that the best interests of the child will be served by such an order" (emphasis added).

St. 1999, c. 6, § 1. The Legislature has thus provided that a judge may enter an order as to "any person" named in G. L. c. 210, § 2, if the required conditions — unfitness and best interests — are met. Nothing in the statutory language suggests that such an order must extend to "all persons" whose consent would otherwise be required under G. L. c. 210, § 2. We agree

---

[9]The 1998 amendment to G. L. c. 210, § 3 (*b*), is the same, except that the word "decree" is substituted for the word "order" in the first line.

with the department that G. L. c. 119, § 26 (4), and G. L. c. 210, § 3 (*b*), authorize the orders entered in this case.[10]

We agree with the department that the termination of the mother's rights significantly eases the children's path to a stable placement. Stability in the life of a child is important, *Adoption of Hugo*, 428 Mass. 219, 228-229 (1998), cert. denied sub nom. *Hugo P.* v. *George P.*, 526 U.S. 1034 (1999), particularly in a case such as this, where the children are exceptionally vulnerable due to a history of extreme neglect and abuse. The judge appropriately recognized that severing all legal relations between the mother and the children, including her right to visit, communicate, or have any contact with them, see *Adoption of Helen*, 429 Mass. 856, 863 (1999), is a critical step in promoting stability in their lives. It is not in their best interests to allow their mother "to interfere with the child[ren], initiate multiple, repetitious litigation, and hinder and delay the eventual adoption of the child[ren] into a fit environment." *Id.* at 862.[11] Many twists and turns arise in the lives of children who are the subject of these proceedings, proceedings that are often lengthy. See, e.g., *Adoption of Hugo, supra.* The Legislature surely did not contemplate that whenever there is a change in circumstances and a new option arises, as happened here, the department is

---

[10]While G. L. c. 119 and c. 210 do not make explicit references to the authority of a judge to terminate the parental rights of only one parent, a number of State Legislatures have addressed with varying specificity the authority of judges to terminate the rights of one parent and not the other. See, e.g., Conn. Gen. Stat. Ann. § 17a-112 (g) (West. Supp. 2000) ("if the parental rights of only one parent are terminated, the remaining parent shall be the sole parent and, unless otherwise provided by law, guardian of the person"); Fla. Stat. Ann. § 39.811 (6) (West Supp. 2001) (limiting authority to five enumerated circumstances); Mo. Stat. Ann. § 211.477.2 (West Supp. 2001) ("if the conditions specified in [§] 211.447 are found to exist as to only one parent, the rights of only that parent with reference to the child may be terminated and the rights of the other parent shall not be affected"); Wis. Stat. Ann. § 48. 43 (3) (West. Supp. 2000) ("if the grounds specified in § 48.415 are found to exist as to only one parent, the rights of only that parent may be terminated without affecting the rights of the other parent").

[11]Unless the mother's legal relation to her children is terminated, she would be entitled to receive notice of all proceedings affecting the welfare of the children, to petition every six months "for review and redetermination" of their current needs, and to participate in an annual permanency planning hearing. See G. L. c. 119, §§ 26, 29B.

required to return to square one and relitigate the rights of an unfit parent.

The mother responds that she will not have the opportunity to interfere with the placement of the children in a stable home because they have already gone to live with their father, thus foreclosing the need for future permanency hearings pursuant to G. L. c. 119, § 29B. We disagree. The possibility of permanent placement of the two younger children with their father does not necessarily foreclose the need for such a hearing. The termination of the biological mother's parental rights leaves open the possibility of adoption of the two younger children by their stepmother, if the children remain permanently with their father. Alternatively, it may become necessary for the department to seek to terminate his parental rights at some future time. Or, as happened with the eldest child, the father may consent to an adoption if the department located a suitable placement for either or both of the children. Under any scenario, their transitions to permanent homes will be expedited if the mother, adjudicated unfit, no longer has the right to participate in the placement process.

The mother's final statutory argument asserts that the judge's order violated the Commonwealth's policy of "protecting a family's integrity" before initiating proceedings to terminate parental rights. Pursuant to G. L. c. 119, § 1,[12] and the department's regulations,[13] she claims that the State may not intervene in a "family" to terminate one parent's rights, where

---

[12]General Laws c. 119, § 1, states in pertinent part that the Commonwealth shall "provide substitute care of children only when the family itself or the resources available to the family are unable to provide the necessary care and protection to insure the rights of any child to sound health and normal physical, mental, spiritual and moral development."

[13]The mother relies on 110 Code Mass. Regs. §§ 1.01, 1.02 (2), 1.02 (4), 1.03 (1993). The department's statement of philosophy, 110 Code Mass. Regs. § 1.01, provides:

"The policy of the Commonwealth of Massachusetts and therefore of the Department of Social Services is to strengthen and encourage family life so that every family can care for and protect its children. To that end, the Department will make every reasonable effort to encourage and assist families to use all available resources to maintain the family unit intact. However, for so long as a family cannot or does not provide the necessary amount of care and protection for its children, the Department will intervene to protect the right of children to sound health and normal physical and mental development. These

there remains a possibility that the children may be placed in the custody of the other parent or another family relative. While we recognize that strengthening a family remains an important objective, in the circumstances of this case, the mother, the father, and the children no longer constitute a single "family" for purposes of G. L. c. 119, § 1. After their divorce, the mother and the father had little, if any, contact, and the father had no contact with his children until termination proceedings were initiated. The department could not, and was not obliged, to "strengthen" a family that no longer existed. By offering numerous services to the mother, and by attempting to reunify her with her children, the department fulfilled its obligation to make "every effort to strengthen and encourage" her bonds with her children before it sought to sever her legal rights. *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption*, 376 Mass. 252, 266 (1978). Thereafter, the judge properly determined that she was unfit to parent her children, and that it was in the children's best interests to free them for adoption or other disposition without her involvement.

Once the father was located, the department separately fulfilled its mandate to him by seeking to determine whether he was fit to assume his parental responsibilities, albeit at some future date. The judge concluded that the father was presently unfit to assume responsibility of his children. But he also found, unchallenged by the mother, that there was insufficient evidence at trial to support a finding that it was in the children's best

dual obligations — to protect children and yet simultaneously to respect the right of families to be free from unwarranted state intervention — present an inherently difficult balance to strike. Yet, this is precisely the Department's mandate. The effort to balance these two basic obligations, above all others, shall govern the Department's activities."

The department's Principles of Service, 110 Code Mass. Regs. § 1.02, provide in pertinent part that:

"In delivering services to children and families the Department shall:

"(1) seek to ensure the safety of children;

"(2) recognize that, consistent with the need to ensure the safety of children, the family is the best source of child rearing, and so require that state intervention into a family unit be used only when it is clearly needed to protect a child;

"(3) reflect the understanding that every child needs stability and permanency . . . ."

interests to terminate the father's parental rights. See *Adoption of Carlos*, 413 Mass. 339, 350-351 (1992). His decision to consider the best interests of the children in regard to each parent separately did not contravene any statute and was not at variance with any public policy.

## III

The mother asserts that, where the State's real goal for the two younger children was reunification with their father, the termination of her parental rights contravened the fundamental right to family integrity and violated her State (art. 12 of the Massachusetts Declaration of Rights) and Federal (Fourteenth Amendment to the United States Constitution) constitutional rights to care for and manage her children without State intervention. The State has no compelling interest in intervening to terminate one parent's right to consent to adoption, she claims, where the second biological parent is currently fit or "soon to be fit" and the State's goal is to reunify the children with that parent.

A parent's relationship with her children is constitutionally protected, but is not immune from State intervention. See, e.g., *Care & Protection of Robert*, 408 Mass. 52, 60 (1990); *Custody of Two Minors*, 396 Mass. 610, 617 (1986), and cases cited. The rights of a child to a stable and safe environment "assume an importance at least equal" to a parent's constitutional interests. *Id.* Where, as here, there is compelling evidence that the mother has neglected her children and is unfit to raise them, the State in its parens patriae capacity may act in the best interests of the children by severing the parent-child relationship without infringing the parent's constitutional rights. See *Care & Protection of Robert, supra.*

We see nothing to support the mother's contention that the termination of her parental rights was in effect a resolution of a custody determination between the mother and the father.[14] The focus of the judge's determination was on the best interests of

---

[14]We acknowledge but reject the suggestion of the amicus curiae that the result we reach today may encourage one parent to seek to terminate the rights of another parent in an effort to obtain custody of their child in a paternity or custody dispute. While individual parents may file care and

the children, and their protection from the neglectful conduct of their mother, particularly in the context of the abusive relationship to which she subjected them. The State's authority to act in the best interests of children is not curtailed because a judge concludes that a child needs protection from one parent, rather than both.

IV

The mother argues that the judge committed an error of law and deprived her of her State (arts. 10 and 12 of the Declaration of Rights) and Federal (Fourteenth Amendment) due process rights because he made no findings as to whether it was in the best interests of the children to permit Willow and Gregory to move to Oklahoma, permanently separating them geographically from their older sibling Nancy, and from their birth mother. Because the judge approved the adoption plan for Nancy and was "well aware" that the department's goal was to reunite Willow and Gregory with their father in Oklahoma, she argues, such specific findings were mandated.

The argument fails for two reasons. First, it is waived: she failed to argue at trial that the separation of the children would not be in their best interests, and it was abundantly clear that the department was recommending separate placements for the children. See *Adoption of Mary*, 414 Mass. 705, 712 (1993). We nevertheless note that the judge's findings adequately took into account the issue of sibling separation. As a general matter, it may be preferable that siblings be raised together. See *Care & Protection of Three Minors*, 392 Mass. 704, 715 (1984), and cases cited. See also G. L. c. 119, § 26 (5). However, the weight to be accorded sibling relations in the application of the best interests standard mandated by G. L. c. 210, § 3, "will vary with the circumstances." See *Adoption of Hugo*, 428 Mass. 219, 231 (1998), quoting *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631, 644 (1975). Here the judge was confronted with the placement of three extremely disturbed children. While an

protection petitions, G. L. c. 119, § 24, only the department or a licensed child care agency may file a petition to dispense with a parent's right to consent. See G. L. c. 119, § 26 (4); G. L. c. 210, § 3 (*b*).

explicit finding as to whether Nancy's separation from her siblings would have been appropriate, the judge's findings strongly indicate (and the evidence supports) that her foster placement had been and would continue to be in her best interests despite the placement of her younger sister and brother in another home.[15]

To the extent it was unanticipated by the mother that the consequence of the judge's order would result in the geographic separation of the children, the judge was not required to make a specific finding as to the effect on Gregory and Willow of a placement in Oklahoma. In light of the introduction in evidence of the interstate compact report and the judge's conclusion that the father's unfitness to assume parental responsibility would continue into the indefinite future, the issue whether a permanent, geographically distant, separation from Nancy or their mother would be in Willow's and Gregory's best interests was not before him. See note 8, *supra*.

## V

We turn finally to the mother's assertion that the evidence of an adoption plan was insufficient to support the termination order. The department's goal at trial for all three children was adoption. Where the department files a petition to dispense with a parent's consent to adoption, it must "concurrently identify, recruit, process and approve a qualified family for adoption." G. L. c. 210, § 3 (*b*). See G. L. c. 119, § 26 (4). The judge is required to "consider the plan proposed by the department or other agency initiating the petition" as part of its assessment whether termination of the parent's rights would be in the children's best interests. G. L. c. 210, § 3 (*c*). The adoption plan need not be fully developed to support a termination order; it need only provide sufficient information about the prospective adoptive placement "so that the judge may properly evaluate the suitability of the department's proposal." *Adoption of Vito,*

---

[15]The judge found that Nancy, who had not lived in the same home as her younger siblings for over one year at the time of trial, was benefiting from a "nurturing, loving, and safe environment;" that her mother stated that Nancy "has blossomed and . . . expressed a desire to remain in her current placement"; and that Nancy's "best interests would be served by remaining in her current placement."

431 Mass. 550, 568 n.28 (2000), quoting *Care and Protection of Three Minors*, 392 Mass. 704, 714 (1984). See *Adoption of Paula*, 420 Mass. 716, 722-723 n.7 (1995). See also G. L. c. 210, § 3 (*b*) (department authorized to commence termination proceeding "independent of a petition for adoption"); *Care & Protection of Valerie*, 403 Mass. 317, 319 (1988) (plan not required to identify prospective adoptive parents). In this case, the plans submitted by the department, in combination with the overwhelming evidence presented at trial concerning the mother's unfitness and the children's best interests, were "sufficiently specific and detailed" to support the termination of the mother's parental rights. *Care & Protection of Three Minors, supra* at 717.

*Decrees affirmed.*