NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

25-P-202                                            Appeals Court

ADOPTION OF VARNELL.[1]


No. 25-P-202.

Hampden.     November 7, 2025. – May 6, 2026.

Present:  Henry, Sacks, & Tan, JJ.


Adoption, Care and protection, Parent's consent.  Parent and
     Child, Care and protection of minor, Adoption, Dispensing
     with parent's consent to adoption.  Minor, Care and
     protection, Adoption.  Practice, Civil, Care and protection
     proceeding, Adoption, Appeal.



     Petition filed in the Hampden County Division of the
Juvenile Court Department on August 20, 2020.

     The case was heard by Lois M. Eaton, J.


     Tsvetelina Gerova-Wilson for the child.
     Julie A. Gallup for Department of Children and Families.


     TAN, J.  After a trial, a Juvenile Court judge adjudicated

the father of Varnell (child or Varnell) unfit and terminated

his parental rights pursuant to G. L. c. 119, § 26, and G. L.

_____

     [1] A pseudonym.

c. 210, § 3.[2]  Varnell appeals the judge's decision to terminate

the father's parental rights.  In this case, we address for the

first time the question whether a child is entitled to appeal an

adjudication or decree in a care and protection case where the

parent does not file a notice of appeal.  We conclude that

because a child possesses an independent interest in maintaining

a connection with a legal parent, a child may seek appellate

relief even if the parent does not.  We also conclude that the

evidence at trial was insufficient to demonstrate that

termination of the father's parental rights served the child's

best interests.  Accordingly, we reverse so much of the April 9,

2024 decree that terminated the father's parental rights.

Background.  We summarize the judge's findings of fact,

supplemented by uncontroverted evidence from the record, and

reserve certain facts for later discussion.[3]

Varnell's parents separated when he was a baby, and Varnell

lived with his mother.  Between 2014 to 2020, the Department of

Children and Families (department) conducted investigations into

---

[2] The Department of Children and Families (department) did not seek to terminate the mother's parental rights, and she entered into a stipulation to unfitness in March 2024.  Neither the mother nor the father appealed.

[3] The parties are not challenging the judge's findings of fact as clearly erroneous, with one immaterial exception discussed in note 11, infra.

several reports of neglect of Varnell by the mother, pursuant to G. L. c. 119, § 51A (51A report).[4] None of the incidents involved the father.

In September 2019, the department spoke to the father during the investigation of a 51A report, and he stated that his involvement with Varnell was "minimal." The father said he would take Varnell to his aunt's house for four or five hours many weekends and that he called and spoke to Varnell several times a week. He told the department that he sometimes took Varnell out to eat or for a haircut and had attended parent meetings at Varnell's school. The father reported that he was living with friends and waiting for a low income apartment to become available.

In August 2020, the department took emergency custody of Varnell after his mother's arrest for allegedly stabbing her boyfriend. Varnell, who was ten years old at the time, was present during the incident. On August 20, 2020, the department filed the present care and protection petition pursuant to G. L. c. 119, § 24, and was awarded emergency temporary custody of Varnell.

---

[4] The department's investigations focused on the mother's history of domestic violence incidents, both as a perpetrator and a victim. Following the investigations, the allegations of neglect were supported due to the mother's exposing Varnell to those incidents and the risk of physical abuse to Varnell.

At the time of Varnell's removal from his mother, Varnell told the department that he would sometimes see his father but could not say how often.  Varnell told the department that his father would pick him up and they would visit at his aunt's house.  In September 2019, Varnell also had told the department that he and the father would get pizza and a milkshake and that his father bought him a bicycle.  However, sometimes the father broke his promises and did not show up for visits.

The day after removing Varnell from his mother's care, the department contacted the father, who stated that he had no place for Varnell to stay and had no family members who could care for him.  At that time, the father told the department that he saw Varnell every few months for a few hours and did not know what went on at the mother's home.

The department made numerous attempts to contact the father during the pendency of the case, but he did not communicate or cooperate with the department, nor did the evidence show that he had any visits with Varnell.  The father never appeared in court, and the department was unable to serve him in-hand with notice of the proceedings.[5]  The father's action plan tasks included contacting the department about his intentions around parenting Varnell.  In 2022, the father called the department

---

[5] Service to the father was accomplished through publication.

and told the social worker that he did not want anything to do with the case and to stop sending him letters.

The department initially placed Varnell in a foster home but moved him to a "Short-term Assessment and Rapid Reunification program." During his first year in placement, Varnell exhibited "significant trauma reactive behaviors," such as running away, jumping out windows, sexualized behavior, destruction of property, and homicidal and suicidal ideation. He was hospitalized in a psychiatric hospital several times and placed on antipsychotic medication to manage his behavior. In December 2021, Varnell was placed in a Department of Mental Health (DMH) clinically intensive residential treatment program, which was the most intensive residential treatment setting of its kind in the State. Varnell is diagnosed with developmental trauma and attention deficit hyperactivity disorder (ADHD) and is prescribed antipsychotic medication and a mood stabilizer. He also has a DMH worker and has engaged with therapists, although he did not have a therapist at the time of trial.

In March 2022, as part of the plan to reunify Varnell with his mother, Varnell had an in-home supervised visit with his mother in her home. The visit went well, but afterward Varnell became dysregulated. A few months later, the department halted the reunification plan after it became aware that the mother continued to associate with "violent individuals."

Varnell reunified with his mother again in August 2023 but returned to residential care a month later after reports that a physical altercation took place between Varnell and his mother while she was intoxicated. During the department's investigation of the physical altercation allegations, Varnell stated that he did not want to return to his mother's house and preferred to be placed with the individual who was serving as his educational surrogate (foster parent). Varnell told the department that his father was not involved with him. However, Varnell and his father spoke by phone at least twice during the month he was reunified with his mother and once while he was placed at the DMH program. Varnell believed that his father wanted to be involved with him but was not allowed to do so because his father had not "sign[ed] some paperwork with the department." Varnell requested to have contact with his paternal half-siblings, but the department's kinship letters elicited no response.

Varnell was fourteen years old when trial commenced. Varnell remained connected with his mother but also had formed a connection with the foster parent "that is substantial and important to him." The department's permanency goal for Varnell at trial was reunification with his mother. The foster parent "wishe[d] to make a long-term commitment to [Varnell], while helping him maintain his relationship with his mother."

Only one witness, Varnell's social worker, testified at trial. When asked why the department sought to terminate the father's rights, the social worker noted the father's unavailability, lack of engagement with the department, and the department's concern that the father would not be able to meet Varnell's needs "if he ever even wanted to step up for [Varnell]."

Discussion. 1. The child's right to appeal. The first issue we address is whether a child may appeal from a decree terminating parental rights where the parent does not file a notice of appeal. Relying on Guardianship of Wilson, 496 Mass. 60 (2025), and Guardianship of Tara, 97 Mass. App. Ct. 11 (2020), the department contends that we cannot grant the child relief because the father is an indispensable party to the appeal, but he did not file a notice of appeal. See Guardianship of Wilson, supra at 64 ("Generally, a court will not proceed to a final determination without an indispensable party"). We are not persuaded and conclude that the department's reliance on these cases is misplaced.

In Guardianship of Wilson, 496 Mass. at 64, the Supreme Judicial Court held that the relatives who had filed the guardianship petitions that were dismissed by a Juvenile Court judge, but who had failed to join in the appeal from the order allowing the department's motion to dismiss, were indispensable

parties to the appeal. Their interests (in their appointment as guardians of the children) and the children's requested relief (vacating the dismissal of the guardianship petitions) "[were] so intertwined" that the court could not grant the relief sought by the children "in the absence of the relatives," whose failure to file a timely notice of appeal in the trial court and to diligently pursue their single justice appeal evinced a lack of "continuing commitment" to serving as guardians. Id. at 64-65.

In Guardianship of Tara, 97 Mass. App. Ct. at 11-12, we concluded that we could not grant the children's request to reverse the denial of the grandmother's guardianship petition and grant guardianship of them to their grandmother. We so held because the grandmother did not appeal, no longer appeared to be seeking appointment as a guardian, and we could not provide any effective appellate relief. Id. "We cannot force a person, even a relative, to assume guardianship over children . . . ." Id. at 12.

This case is distinguishable from Guardianship of Wilson and Guardianship of Tara. The father, because of his existing legal relationship to the child, was a party to the care and protection proceedings. In contrast, the relatives in Guardianship of Wilson and Guardianship of Tara had no underlying legal relationship to the children and were seeking to establish a legal relationship through the filing of

guardianship petitions.  Those relatives therefore could not be forced to assume a legal relationship they no longer sought by failing to appeal.

We agree with Varnell's contention that a child has an independent interest in maintaining a connection with a legal parent and that the father's lack of participation or even willingness to remain the parent is immaterial.  "Massachusetts law recognizes children's interests in parental consortium as filial needs for closeness, guidance, and nurture" (quotation and citation omitted).  Adoption of Mariano, 77 Mass. App. Ct. 656, 662 (2010).  Our laws confer upon a child the right to appeal "from the adjudication of the court and from any order of commitment made as a result of the adjudication . . . to the appeals court."  G. L. c. 119, § 27.  Nothing in G. L. c. 119, § 27, limits the child's right to appeal or conditions it upon a parent's filing a notice of appeal.

This conclusion is consistent with our recognition, in other contexts, of the importance of establishing and maintaining a legal relationship between a child and a parent, even when a parent does not demonstrate an interest or desire in doing so.  For example, in parentage petitions, a child has the right to file a complaint to establish parentage and support against a father regardless of whether the father wishes to recognize the child.  G. L. c. 209C, § 5 (a).  See Adoption of

Mariano, 77 Mass. App. Ct. at 662 ("[A child's] entitlement to the potential consortium of a father remains intact even against the present will of the father").

In Adoption of Mariano, 77 Mass. App. Ct. at 656-657, the divorcing parents of an infant submitted to the Probate and Family Court an adoption petition filed by the mother and an adoption surrender form executed by the father such that "the mother would assume the role of sole parent." The judge denied the adoption petition, finding that "it is not the wishes of the parents, but rather the best interests of the child that determine adoption" and that "in this instance the preservation of a connection between [the child] and his father served the best interests of the child and maintained a link to his biological identity." Id. at 659. In upholding the dismissal of the adoption petition, we recognized not only the public policy interest in ensuring "that parents, not the State, should support their children," id. at 662, quoting Adoption of Marlene, 443 Mass. 494, 501 (2005), but also the child's interest in parental consortium, "in the identification of a biological father[,] and in the potentiality of the guidance, companionship, and affection of that biological father either now or later." Adoption of Mariano, supra at 663. See id. (child had "important interest in the reservation of the father's option for a change of mind or heart over time").

Accordingly, we conclude that the child has a right to appeal even though the father did not file a notice of appeal.

2. <u>Termination of the father's parental rights</u>.  "In deciding whether to terminate a parent's rights, a judge must determine whether there is clear and convincing evidence that the parent is unfit and, if the parent is unfit, whether the child's best interests will be served by terminating the legal relation between parent and child."  <u>Adoption of Ilona</u>, 459 Mass. 53, 59 (2011).  "The natural bond between parent and child should not be permanently severed unless the child's present or future welfare demands it."  <u>Adoption of Carlos</u>, 413 Mass. 339, 350 (1992).  We review a termination of parental rights decision to "determine whether the trial judge abused [their] discretion or committed a clear error of law."  <u>Adoption of Elena</u>, 446 Mass. 24, 30 (2006).

Varnell does not challenge the judge's finding of the father's unfitness, but argues that the judge abused her discretion by concluding that the termination of his father's parental rights served Varnell's best interests.  See <u>Adoption of Carlos</u>, 413 Mass. at 350 ("The natural bond between parent and child should not be permanently severed unless the child's present or future welfare <u>demands</u>" termination [emphasis added]).  Although the evidence here clearly supported the judge's finding of the father's unfitness, we conclude that the

evidence failed to demonstrate that termination served the child's best interests.

We are mindful of the judge's findings that the father "never attended to the child's welfare, education, medical care, psychological well-being, or living situation" and never sought to be his custodian. Indeed, the father did not engage with the department and asked the department to stop contacting him. However, "even if a parent is found to be unfit, there are some situations in which the child's best interest may be served without a decree of termination." Adoption of Flora, 60 Mass. App. Ct. 334, 342 (2004). Based on our review of the record, which is devoid of evidence that the father would attempt to interfere with decisions about Varnell's placement or otherwise do anything contrary to Varnell's best interests, we conclude that this is one of those situations. To be clear, our holding is limited to these facts and we can certainly envision cases where a parent's lack of engagement with the department and services contribute to a conclusion that terminating the parent's rights serves a child's best interests. See Adoption of Meaghan, 461 Mass. 1006, 1007 (2012) ("While a child has an interest in family integrity, it may also be in the child's best interests permanently to terminate the parent's rights").

Here, the evidence demonstrated that Varnell wanted the possibility to have his father be part of his life, even if on

an inconsistent basis.  Prior to the department's removal of Varnell from his mother, Varnell had a relationship with his father, who took him out for pizza and milkshakes, bought him a bike, and at a minimum, had phone calls with him during the month Varnell reunified with his mother.[6]  We do not equate the father's disinterest in having contact with the department after Varnell was placed in the department's custody with a disinterest in maintaining contact with Varnell.  Importantly, Varnell wanted to preserve his relationship with his father and believed that his father wanted to see him but could not because his father had not signed paperwork with the department.  Varnell's wishes regarding whether his father's parental rights should be terminated should be considered in assessing his best interests.  See Adoption of Ramona, 61 Mass. App. Ct. 260, 267 (2004) ("Because [the children] are old enough to have a final say as to their own adoptions, the wishes of each child as to termination should be considered in determining their best interests"); Adoption of Flora, 60 Mass. App. Ct. at 342 (child's wishes as to termination should be considered on remand).  Varnell opposed the termination of his father's

---

[6] Varnell's social worker admitted that he did not know exactly how much contact Varnell had with the father because Varnell tended to withhold information from the worker.

parental rights at trial and continues to oppose termination on appeal.[7]

Moreover, the evidence here did not support a concern that the father would attempt to interfere in any way with future custody decisions or "other disposition[s]" for Varnell.[8] Although the judge appeared to be motivated by the laudable goal of preventing the father from disrupting future custody decisions, the evidence demonstrated that the father never

---

[7] The department social worker had not discussed with Varnell the issue of adoption or the possibility that his father's parental rights would be terminated. The judge found, based on the social worker's testimony, that "[h]aving a therapist in place [for Varnell] to help him process the termination of his father's rights would be beneficial." Yet Varnell had no therapist during the five months before trial, and at the time of trial he was still on a waiting list to obtain one. Although the judge credited the social worker's opinion testimony that "a termination decree would [not] have much impact on [Varnell's] mental health," we note with concern that the department advocated at trial for the termination of the father's parental rights as serving Varnell's best interests, without having first discussed the issue with Varnell and potentially giving him an opportunity to process it in therapy or at least with the social worker. The social worker agreed that exploring the topic in therapy "would be better," because Varnell "often needs extra time and extra support around big decisions."

[8] In terminating the father's parental rights, the judge found that there will no longer be a requirement to seek the father's consent or give him notice "for any legal proceeding affecting the custody, guardianship, or other disposition of [Varnell]. He will not be consulted on [Varnell's] welfare, education, medical care, psychological well-being, living situation, or who his legal custodian will be." See G. L. c. 210, § 3 (b). The judge further concluded that "it is appropriate to cease all attempts to have the father make decisions for his son or to engage him in the process."

interfered with the mother's parental decision-making or with Varnell's foster placements. In fact, the judge found that the mother facilitated communications between Varnell and his father. There was no finding, and nothing in the record suggests, that the father would attempt to disrupt any placement or oppose any permanency plan if his parental rights remained intact.

It is also significant that termination of the father's parental rights did not clearly help Varnell to achieve either the department's actual permanency goal of reunification or the judge's recommended concurrent goal. The judge found that, "[a]lthough it is appropriate to continue working toward reunification between [Varnell] and his mother, concurrent long-term planning such as guardianship or adoption also should be explored . . . due to the length of time Varnell has been in the [d]epartment's care and the importance of establishing a permanent and stable home for [Varnell] that can meet his special needs,"[9] as well as the "improbability that [Varnell's]

_____

[9] We note that (1) a guardianship appointment may be finalized even if the father's parental rights remain intact, see G. L. c. 190B, § 5-204 (a) (i), (v); (2) a child over the age of fourteen like Varnell may object to the appointment of a guardian pursuant to G. L. c. 190B, § 5-203 (i); and (3) since a child over the age of twelve must consent to a decree of adoption pursuant to G. L. c. 210, § 2, adoption was not a viable permanency goal as of the date of trial.

mother can meet his needs."[10]  Because the department did not seek to terminate the mother's parental rights, the judge's decision to terminate the father's parental rights did not free Varnell for adoption (which was not the department's permanency goal for Varnell).

To be sure, there may be cases where termination of one parent's rights while maintaining the other parent's rights serves a child's best interests, see, e.g., Adoption of Willow, 433 Mass. 636 (2001), even if the permanency plan may not be adoption.  In Adoption of Willow, where the court affirmed the termination of the mother's rights despite the nontermination of the father's rights, the court reasoned that "severing all legal relations between the mother and the children . . . [was] a critical step in promoting stability in their lives" and that it was not in the children's best interests "to allow their mother 'to interfere with the child[ren], initiate multiple, repetitious litigation, and hinder and delay the eventual adoption of the child[ren] into a fit environment.'"  Id. at 647, quoting Adoption of Helen, 429 Mass. 856, 862 (1999).  However, we conclude that the department failed to demonstrate

---

[10] If the parent's parental rights remain intact and the department changes Varnell's permanency goal to adoption, any party may file a motion for review and redetermination and seek a hearing to terminate either parent's rights.  See G. L. c. 119, § 26 (c).

that those concerns are present here, and the facts in this case are distinguishable from those in Adoption of Willow. The mother in Adoption of Willow subjected the children to repeated and brutal physical abuse, failed to ensure that they were properly clothed and educated, and housed them in deplorable living conditions. See Adoption of Willow, supra at 640. Furthermore, unlike the children in Willow, whose permanency goal was adoption, id. at 639, Varnell's permanency goal is reunification, albeit with his mother.

Similarly, we can imagine cases where a parent engages in efforts to obstruct, disrupt, or interfere with the child's placement or permanency plan to the detriment of the child's stability. See Adoption of Thea, 78 Mass. App. Ct. 818, 825 (2011), quoting Adoption of Nancy, 443 Mass. 512, 517, 518 (2005) ("We recognize that stability and permanence in a child's life may in some cases be 'eased' by termination of parental rights 'even when it is not a prerequisite for the implementation of the permanency plan'"). However, this is not such a case -- the father here has never attempted to disrupt Varnell's stability or placement.

The department's permanency goal for Varnell was not adoption nor did the termination of the father's parental rights free Varnell for adoption, and there was no evidence that the father would attempt to interfere with or obstruct any future

placement or custody decisions.  Although the father did not engage with the department or with court proceedings, the record demonstrated that Varnell and his father continued to have a relationship, one that Varnell wishes to maintain.

Conclusion.  While we can imagine that a parent's lack of engagement and unfitness might help support a conclusion that termination of that parent's rights serves the child's best interests in some cases, in this case the department failed to prove that termination of the father's parental rights served the child's best interests.  Accordingly, we reverse so much of the April 9, 2024 decree that terminated the father's rights.[11]

So ordered.

---

[11] In light of our disposition, we need not reach the child's arguments that the judge erred in concluding that the child's derivative rights, such as his rights to inherit from his father or any rights that might arise under the Social Security Act, stemming from his legal relationship with his father survive the termination of the father's parental rights. Nor do we reach the child's argument that the judge erroneously found that the department sought termination of the father's rights "based upon clinical advice from [the child's] providers," although we note that the department concedes the point.

HENRY, J. (concurring).  I agree with the reasoning and the outcome of the court's opinion.  I write separately because I think that we also should decide what rights are and are not terminated when a judge "terminates parental rights" by a decree issued pursuant to G. L. c. 119, § 26, and G. L. c. 210, § 3.  Are we rendering children legal orphans or legal half-orphans even if they are never adopted?[1]  If so, why?  We are needlessly adding to the trauma of children and parents and should stop causing that harm.

The scope of the rights terminated was ruled upon by the trial judge here, is fiercely disputed by the child and the department, and is likely to arise on remand.  Moreover, this is a significant question for the many children who were or will not be adopted after the termination of parental rights.  We owe

---

[1] The phrase "legal orphan" is not hyperbole.  It has been referenced and not disavowed in the case law under G. L. c. 119, § 26, and G. L. c. 210, § 3.  See, e.g., Adoption of Nancy, 443 Mass. 512, 516 (2005) (father and children argued termination of father's parental rights will render children "legal orphans"); Adoption of Ramona, 61 Mass. App. Ct. 260, 265, 266 (2004) (noting, where sons opposed adoption and "remained connected" with mother, "there is reason to think that terminating the mother's rights as to either boy might render them legal orphans"); Adoption of Gertrude, 99 Mass. App. Ct. 817, 820 (2021) (mother and daughters argued as part of their cost-benefit analysis that one negative impact of termination was daughters would be rendered "legal orphans").  Numerous unpublished memoranda and orders pursuant to our rule 23.0 also use the phrase "legal orphan."

them a decision and a coherent rationale consistent with the language of the statutory scheme.

Consistent with the language in both statutes, the judge entered a decree that "terminate[d] the rights of the [father] to receive notice of or to consent to any legal proceeding affecting the custody, guardianship, adoption or other disposition of the child."[2]  This statutory language is referred to in our cases by the phrase "termination of parental rights."

What is terminated or dispensed with is "the need for consent" of the parent or other individual "to the adoption, custody, guardianship or other disposition of the child named

---

[2] Parental custodial rights may be terminated under either G. L. c. 119, the care and protection statute, or G. L. c. 210, the adoption statute.  See Adoption of Willow, 433 Mass. 636, 643 (2001).  General Laws c. 119, § 26 (b) (4), provides:  "[I]f the court adjudicates the child to be in need of care and protection under this section, the court shall enter an order dispensing with the need for consent to adoption upon finding that the best interests of the child . . . will be served thereby.  The entry of such an order shall have the effect of terminating the rights of a person named [in G. L. c. 210, § 2] to receive notice of or to consent to any legal proceeding affecting the custody, guardianship, adoption or other disposition of the child named [in the petition]."  Similarly, G. L. c. 210, § 3 (b), provides:  "[If the court] finds that the best interests of the child . . . will be served[,]" the court "shall issue a decree dispensing with the need for consent or notice . . .  The entry of such a decree shall have the effect of terminating the rights of a person named [in G. L. c. 210, § 2] to receive notice of or to consent to any legal proceeding affecting the custody, guardianship, adoption or other disposition of the child named [in the petition]."

therein." G. L. c. 119, § 26 (b) (4).[3] In other words, once both parents' rights are terminated, the child is legally free for adoption. Unless and until the child is adopted, nothing more has occurred.

"'Custody,' as statutorily defined, entails 'the following powers: (1) to determine the child's place of abode, medical care and education; (2) to control visits to the child; (3) to consent to enlistments, marriages and other contracts otherwise requiring parental consent.'" Petition of Catholic Charitable Bur. of the Archdiocese of Boston, Inc., to Dispense with Consent to Adoption, 392 Mass. 738, 740 (1984), quoting G. L. c. 119, § 21, as amended through St. 1978, c. 552, § 28.[4]

It is unfortunate but true that some cases have been imprecise in their language about the different legal consequences associated with termination of parental rights in contrast to adoption. For example, in Adoption of Helen, 429 Mass. 856 (1999), the Supreme Judicial Court stated that, "[t]he focus of [a termination] proceeding is not whether the parent

_____

[3] The statute refers to the parent or "any other any person named in section 2 of chapter 210." G. L. c. 119, § 26 (b) (4). General Laws, c. 210, § 3 (b), contains a similar provision. See note 2, supra.

[4] The statutory definition of "custody" has remained essentially unchanged since 1978. See G. L. c. 119, § 21, as amended through St. 2020, c. 227, § 44.

should be deprived of 'custody' in order to safeguard the child's well-being, but rather whether 'it would be in the best interests of the child for all legal relations [with the parent] to be ended'" (citation omitted). Id. at 863. However, the case on which Adoption of Helen relies for this proposition states that it is "[w]hen a child is adopted" that "all rights, duties and other legal consequences of the natural relation of child and parent . . . except as regards marriage, incest or cohabitation, terminate between the child so adopted and his natural parents[5] and kindred" (emphasis added; citation omitted). Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption, 391 Mass. 113, 119 (1984). See Adoption of Carlos, 413 Mass. 339, 350-351 (1992) (referring without reasoning to "the irreversible termination of the parent-child legal relationship under c. 210, § 3"). Logically, if the termination of parental rights severed all legal

_____

[5] It also time for the judiciary to stop referring to "natural parents." The Massachusetts Parentage Act (MPA), effective January 1, 2025, updated State law to ensure equal parentage rights for all families, particularly benefiting those who establish parentage through marriage, those who use assisted reproduction or surrogacy, and lesbian, gay, bisexual, transgender, or queer (or questioning), and others (LGBTQ+ persons). The MPA replaces gendered and outdated language, simplifies establishing legal parentage, and recognizes de facto and intended parents. See G. L. c. 209C, as amended through St. 2024, c. 166, §§ 5-9 (effective Jan. 1, 2025).

relations between the parent and child, then there would be nothing left for adoption to sever.

Adoption is what terminates all rights of the parent -- not a termination decree pursuant to G. L. c. 119, § 26, and G. L. c. 210, § 3. In fact, in Adoption of Helen, 429 Mass. at 863, the Supreme Judicial Court continued on to correctly state the consequence of a termination of parental rights: "[t]ermination denies the natural parents physical custody, as well as the rights ever to visit, communicate with, or regain custody of the child."[6,7] In other words, the termination of parental rights pursuant to G. L. c. 119, § 26, and G. L. c. 210, § 3, may

---

[6] This court also collapsed the difference between the consequences of adoption and termination of custodial rights in Adoption of Donald, 52 Mass. App. Ct. 901 (2001). We stated that the mother argued both "that not all parental rights are terminated upon the entry of a decree pursuant to G. L. c. 119, § 26, or G. L. c. 210, § 3, and further that until the decree terminating her rights to notice or to give consent has run the course of possible appellate review," she could participate in postdecree permanency hearings. Adoption of Donald, 52 Mass. App. Ct. at 902. Although we identified two arguments by the mother, we said "[t]his argument" was without merit. We then addressed only the second argument, stating "[i]t is the entry of the decree, and not affirmance on appeal or eventual adoption of the child, that terminates a parent's rights to physical custody and right to regain custody, as well as to notice of or consent to adoption, of the child." Id.

[7] While the parents' right to visit is terminated, if it is in the best interests of the child, the trial judge has discretion to continue visitation between the parent and the child. See Adoption of Douglas, 473 Mass. 1024, 1027 (2016); Adoption of Warren, 44 Mass. App. Ct. 620, 626 n.5 (1998).

potentially lead to the termination of all parental rights. But the termination of all parental rights occurs only if and when the child is adopted.[8]

The Supreme Judicial Court's decision in Adoption of Marlene, 443 Mass. 494 (2005), supports this conclusion. In that case, the court held that when a parent consents to the adoption of their child pursuant to G. L. c. 210, § 2, the consent "does not terminate the parental duty to support the child." Adoption of Marlene, supra at 495 (affirming judge's order granting child's motion seeking child support from father who voluntarily consented to her adoption). In interpreting the statutory language, the court held that the words of the statute "mean only that the surrender is final as to the enumerated rights being surrendered." Id. at 500. Those rights are to "notice of any legal proceeding that affects the 'custody, guardianship, adoption or other disposition' of the child." Id. at 499, quoting G. L. c. 210, § 2. "Section 2 says nothing and implies nothing concerning the termination of a parent's support obligations." Adoption of Marlene, supra at 498. Put differently, G. L. c. 210, § 2, accomplishes by parental consent

---

[8] I also note that the MPA permits a child to have more than two legal parents. See G. L. c. 209C, § 26 (c), added by St. 2024, c. 166, § 65. It is for another day whether the passage of the MPA should result in changes to the consequences of adoption.

what an order pursuant to G. L. c. 119, § 26, and G. L. c. 210, § 3, can dispense with involuntarily after a trial. Applying the same reasoning to those statutes, the effect of a termination decree is limited to what the statutes say: the court "may dispense with the need for consent of any person named in section 2 of chapter 210 to the adoption, custody, guardianship or other disposition of the child named therein." G. L. c. 119, § 26 (b) (4).[9] See G. L. c. 210, § 3 (b).

Indeed, unless a child is adopted, there is no reason to terminate all parental rights. What purpose does it serve to sever entirely the legal relationship between the parent and the child if the child is never adopted?

In this case, the child objected to the termination of the father's parental rights. Although the father's involvement in the child's life has been so limited that when the mother was found unfit, the child was placed in the custody of the department, the connection to the father this child feels is meaningful to him. To the extent the decree made the child a "legal half-orphan," as the child argues and some cases seem to

---

[9] There is one difference between a voluntary surrender of the right for consent to adoption and the involuntary termination of that right. By statute, after an involuntary termination, the right to support is barred. See G. L. c. 209C, § 22 (a) ("A decree or judgment entered on a petition filed pursuant to sections three or six of chapter two hundred and ten shall be a bar to a proceeding under this chapter"). To the extent that the judge concluded otherwise here, the judge erred.

hold, it is not hard to conceive that the severance of the father's and the child's legal relationship imposed on the child against his wishes might unnecessarily inflict emotional distress on him. In addition, it is possible that the termination of all legal rights prior to adoption could also cause this child and others financial harm by potentially ending the child's right to inheritance or other benefits based on the parent-child relationship. For example, if the father dies intestate tomorrow, the child should have inheritance rights. If Adoption of Helen and other cases are read broadly, he would not.

Even if we abandon the plain language of G. L. c. 119, § 26 (b) (4), and G. L. c. 210, § 3, which we should not, I would hold that the greater statutory authority to terminate all parental rights includes the authority to do less. In other words, the trial judge was permitted to, could, and did enter a decree that terminated the right of the father "to receive notice of or to consent to any legal proceeding affecting the custody, guardianship, adoption or other disposition of the child" and nothing more. As the trial judge explained, it was the father's rights that were terminated, not the child's. She ruled that the child retained the right to inherit, obtain social security benefits (assuming he otherwise qualifies), have his father on his birth certificate, and pursue visitation with

his father.  I agree with those legal conclusions.  I would hold that the decree terminated the rights of the father to receive notice of or to consent to any legal proceeding affecting the custody, guardianship, adoption or other disposition of the child; the decree did not terminate all legal relations between this parent and this child.