PETITIONS OF THE DEPARTMENT OF SOCIAL SERVICES TO
DISPENSE WITH CONSENT TO ADOPTION.

Middlesex. December 1, 1986. — February 23, 1987.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, LYNCH, & O'CONNOR, JJ.

*Adoption,* Dispensing with parent's consent. *Evidence,* Communication between patient and psychotherapist, Privileged communication, Hospital record. *Privileged Communication.*

Where the judge who denied petitions under G. L. c. 210, § 3, to dispense with the need for parental consent to the adoption of two minor children had erroneously determined that the psychotherapist-patient privilege created by G. L. c. 233, § 20B, operated to preclude him from considering any of the information contained in records of the mother's hospital admissions, this court, recognizing the privileged character of such records only to the extent that they contain the communications or notes of communications between a patient and a psychotherapist, remanded the case for the judge to consider the petitions anew, assessing the relevant, admissible information in the hospital records, as well as the other evidence before him and, in his discretion, any more recent evidence that he might find necessary or helpful. [286-290]

PETITIONS filed in the Middlesex Division of the Probate and Family Court Department on October 30, 1981.

The cases were consolidated and were heard by *Vincent F. Leahy,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Jura Strimaitis (George Casey* with her) for Department of Social Services.

*Jeffrey Quinn* for the parents.

ABRAMS, J. On October 21, 1985, a judge of the Middlesex Division of the Probate and Family Court Department entered a judgment dismissing petitions of the Department of Social

Services (department)[1] to dispense with the need for parental consent for the adoption of two minor children. G. L. c. 210, § 3 (1984 ed.). The department appealed the decision to the Appeals Court. The Appeals Court, in an unpublished memorandum and order, see 22 Mass. App. Ct. 1113 (1986), remanded the case to permit the judge to examine the hospital records of the mother, Mrs. B, and to consider those records which are not covered by the psychotherapist-patient privilege. G. L. c. 233, § 20B (1984 ed. & Supp., Dec. 1986). We granted the parents' application for further appellate review. We agree with the Appeals Court that the cases must be remanded to the judge to permit examination and consideration of those portions of the hospital records which are not covered by the psychotherapist-patient privilege.

We summarize the facts and proceedings from the findings of fact of the judge, supplemented by portions of the uncontested testimony and documentary evidence. Mrs. B, who was born in 1941, experienced a troubled childhood. When she was five years old, her own mother suffered a "psychotic breakdown" and she and her sister were placed in an orphanage. Mrs. B lived in this orphanage for eight years until she was thirteen. She then was reunited with her family. Subsequently, Mrs. B's sister, like her mother, suffered a "psychotic breakdown" and had to be hospitalized.

The two children who are the subject of the department's petitions are Mrs. B's daughter, born on September 5, 1977, and Mrs. B's son, born on August 9, 1979.[2] The father of these

---

[1] During the course of these proceedings, the agency charged with the authority for providing protective services to children and their families was changed from the Department of Public Welfare to the current agency, the Department of Social Services. See G. L. c. 18B, inserted by St. 1978, c. 552, § 10. We shall refer to both agencies as the "department."

[2] Mrs. B had another child from a prior marriage. Although this child is not involved with the current petitions, the judge attributed some importance to Mrs. B's experience with her. When this child was thirteen, Mrs. B placed her in the care of a priest, who filed a care and protection petition. See G. L. c. 119, § 24. Permanent custody of this child was awarded to the department in 1977. Because this child was suffering severe emotional problems, she was placed in residential care.

children, Mrs. B's second husband, is mildly retarded and according to the judge, "cannot be seriously considered as a custodial parent." See note 16, *infra.* Throughout their marriage, Mr. and Mrs. B have had serious marital problems. Mr. B frequently left Mrs. B for indeterminate lengths of time due to this marital discord.

Mrs. B gave birth to her daughter at New England Memorial Hospital. During this pregnancy, the department had offered Mrs. B various support services, which she refused. Three days after the child was born, Mrs. B left the hospital, against the advice of her doctors, without her baby, claiming she could not get any rest in the noisy ward. Fearing abandonment, the hospital filed a report with the department pursuant to G. L. c. 119, § 51A.[3] The next day, after communicating with a social worker from the department, Mrs. B decided to return to the hospital. After discharge from the hospital, Mrs. B, the social worker, and the hospital developed a service plan, which included weekly visits by social workers from the department and the hospital, counseling visits at the hospital for Mrs. B, homemaker services, and continued medical care for the baby.

Gradually, Mrs. B ceased adherence to the service plan. She repeatedly fired the homemakers hired by the department to help her. As well, the social workers had difficulty remaining in communication with Mrs. B.[4] In late 1977, Mrs. B moved out of her apartment and into a motel.[5] Mrs. B was financially

---

[3] In pertinent part, G. L. c. 119, § 51A (1984 ed. & Supp., Dec. 1986), provides: "Any physician . . . who, in his professional capacity shall have reasonable cause to believe that a child under the age of eighteen years is suffering serious physical or emotional injury resulting . . . from neglect . . . shall immediately report such condition to the department by oral communication and by making a written report within forty-eight hours after such oral communication . . . ."

[4] For example, Mrs. B changed her telephone number and the new number was unlisted, making it difficult for the social worker to communicate with her. Also, the social worker found that Mrs. B was not home for days at a time.

[5] Although the baby generally accompanied Mrs. B on these stays at motels, on at least one instance, Mrs. B admitted that she went to the motel alone, leaving the baby with her husband, because she wanted to read. Shortly after her arrival at the motel, Mrs. B was joined by her husband and daughter.

able to make this move because she had received an inheritance of $23,000. The judge found that Mrs. B moved into the motel because she needed a vacation. Mrs. B remained in the motel room from February to May of 1978, at which point the entire inheritance was spent.

Although it is not clear how much time had passed since the social worker had met with Mrs. B, the social worker eventually found Mrs. B penniless at a motel. The social worker arranged for Mrs. B and her baby to spend another night at the motel. When the social worker arrived the next day, Mrs. B and the child had left. The room was a mess with food and litter strewn about. The social worker thereafter filed a care and protection petition in Somerville District Court and the baby was removed from the custody of her parents.

The child was placed with a foster family and a new service plan was formulated. This service plan included counseling, medication consultation, housing, work-related rehabilitation services for Mr. B, and weekly visitation with the daughter. The intent of this service plan was to reintegrate the baby into her parents' home.

In May of 1979, visitation with this child ceased because Mrs. B, then pregnant with her son, entered the psychiatric unit of a hospital. Mrs. B was under a great deal of stress, both because the pregnancy was a difficult one and because of financial and marital difficulties. After Mrs. B was released from the psychiatric unit, she sought help with her pregnancy at another hospital. Because she was experiencing pain with this pregnancy, Mrs. B, then seven months pregnant, asked a nurse at the hospital to terminate the pregnancy. When the hospital refused her request, Mrs. B threatened to kill herself and her baby. The baby was born two months later and the hospital immediately filed a § 51A report.[6] At the same time, a care and protection petition was filed in the Boston Municipal Court. Thus, this child was committed to the department's custody four days after his birth. He was placed in foster care and has never resided with his parents.

---

[6] See, *supra*, note 3.

In November of 1979, full hearings were held concerning the custody of the children. The department was granted temporary custody of the daughter on November 19. The son was committed permanently to the custody of the department on November 15.[7] At this time, both children were placed in the same foster home.[8]

Visitation by Mrs. B during the next two years was sporadic and generally unsuccessful. Because the visits were only one hour and always supervised by a social worker, Mrs. B found them very painful experiences. Moreover, as Mrs. B became more involved in her own marital and financial problems, the visits seemed to deteriorate. The judge found that, during this time, the parties did not interact well, with Mrs. B telling the children of her lack of food and money and other subjects inappropriate for young children. In one visit, the daughter held her hands over her face for one-half hour. After this visit, the daughter refused to eat and stated that she did not want any further visits with "that lady." As a result of this child's failure to eat, her foster parents consulted a pediatrician, who diagnosed her as having anorexia. This doctor attributed the anorexia to the child's anxiety over continued visitation with Mrs. B. As a result, visitation ceased from July, 1981, to October, 1981. The visits began again in October and November, 1981, but they did not go well. The children continued to experience emotional upsets during and following the visits. The last visit the parents had with their children was in December, 1981.

In addition to the problems the children experienced during visitation, the department had difficulty obtaining cooperation from Mrs. B in scheduling visits and keeping appointments. On several occasions, Mrs. B would cancel visitation com-

[7] The order of permanent commitment was appealed pursuant to G. L. c. 119, § 27. After trial de novo, the permanent custody order was upheld on April 1, 1980.

[8] The children have been removed from their first foster home because Mrs. B harassed the foster family. Mrs. B accused the foster parents of abusing the older child. The police investigated the matter and deemed the charges unfounded.

pletely because she wanted the children at home, and not simply the right to visit them. On one occasion, when visitation was resumed, Mrs. B demanded that all visits occur early Monday morning because the children were very important to her and thus it was fitting that visitation should occur on the first working day of the week. The department found it impossible to schedule the visits at this time, and, although Mrs. B did not work and could visit the children at other times, she continued to insist on Monday morning visits. In addition, during this time, Mrs. B told social workers that she had no food or money. Although the department offered help, Mrs. B refused their assistance. She refused all involvement with the department's service plan. The judge noted in his findings that "[t]hroughout her testimony the mother related how she pleaded for help, and no one would help her. But the fact is that she continually refused most of the help offered to her, whether by DSS, hospitals, doctors, therapists, homemakers, and others."

On October 30, 1981, the department filed petitions pursuant to G. L. c. 210, § 3, to dispense with parental consent to adoption, thereby freeing the children for adoption. A guardian ad litem and attorneys for the children and the parents were appointed and the matter was assigned to trial. The trial was postponed several times because the parents continually fired their attorneys. The record reveals that at least six attorneys have withdrawn from the case during the proceedings. In October, 1982, the judge allowed a motion to dismiss the c. 210 petition concerning the older child because the department did not have permanent custody of her. See *Adoption of a Minor,* 386 Mass. 741, 748-749 (1982). The department obtained permanent custody in January, 1983, and the Appeals Court affirmed the award of permanent custody in December, 1983. *Custody of a Minor,* 17 Mass. App. Ct. 1105 (1983). The department filed a second c. 210, § 3, petition on behalf of the daughter in February, 1983, and this petition was consolidated with the petition filed on behalf of the son.[9] Prior to

---

[9] The younger child's case also was reviewed by the Boston Municipal Court in 1983.

399 Mass. 279                                              285

Petitions of the Department of Social Services to Dispense with Consent to Adoption.

trial, the court ordered the parents to undergo a psychiatric evaluation. They refused. The guardian ad litem[10] and the children's attorney filed reports with the court and the department filed adoption plans with the court, as required by G. L. c. 210. The matter was heard on July 31 to August 2, 1985.

Five social workers and the guardian ad litem testified for the department. Their testimony focused on the parents' refusal to take advantage of the professional aid offered them, and the effect of the parents' emotional and mental problems on their ability to provide appropriate parental support and guidance. The parents testified, as well as a neighbor and a relative, on their behalf. Mrs. B's hospital records for birth of the children were admitted in evidence. Also, the records from Mrs. B's visit to the psychiatric unit were admitted.[11] During the course of the hearing, the parties discussed with the judge the applicability of G. L. c. 233, § 20B,[12] the psychotherapist-

---

[10] Although the guardian ad litem made several attempts to visit and talk with Mr. and Mrs. B, she was unsuccessful as they refused to see her.

[11] The record reveals that the notes of Mrs. B's psychiatrist were also admitted in evidence by stipulation. The judge, in his findings, stated that the stipulation was entered into before our decision in *Petition of Catholic Charitable Bureau of the Archdiocese of Boston, Inc., to Dispense with Consent to Adoption*, 392 Mass. 738 (1984), and, in light of that decision, he ruled that these notes were covered by the psychotherapist-patient privilege; therefore he did not consider them. It is unclear on this record whether counsel withdrew the stipulation on the basis of our decision in *Catholic Charitable Bureau*. If the stipulation was not withdrawn, the evidence is admissible for all purposes and could have been considered by the judge. See *Commonwealth* v. *Triplett*, 398 Mass. 561, 570 (1986); P.J. Liacos, Massachusetts Evidence 16 (5th ed. 1981).

[12] In relevant part, G. L. c. 233, § 20B, provides: "Except as hereinafter provided, in any court proceeding and in any proceeding preliminary thereto and in legislative and administrative proceedings, a patient shall have the privilege of refusing to disclose, and of preventing a witness from disclosing any communication, wherever made, between said patient and a psychotherapist relative to the diagnosis or treatment of the patient's mental or emotional condition. . . .

"The privilege granted hereunder shall not apply to any of the following communications: —
  ". . . .
  "(e) In any child custody case in which, upon a hearing in chambers, the judge, in the exercise of his discretion, determines that the psychotherapist has evidence bearing significantly on the patient's ability to provide suitable custody, and that it is more important to the welfare of

patient privilege, to the hospital records admitted in evidence. It appears that the parties and the judge agreed that records of conversations between the psychotherapist or psychiatrist and Mrs. B are privileged and should be excluded. Although at the hearing the parties agreed to examine the hospital records to exclude the portions which were privileged, the judge's findings reveal that the parties were unable to do this. The judge stated that "the hospital records are so interwoven with psychiatric data that it would not be possible to exclude them in any practical way so that the balance of the records could be examined." Therefore, the judge did not review any of the hospital records.[13] Without access to any psychiatric evidence concerning Mrs. B, the judge stated that he could not find, by clear and convincing evidence, that the mother was unfit and so he found it necessary to dismiss the petitions.

Through his interpretation of *Petition of Catholic Charitable Bureau of the Archdiocese of Boston, Inc., to Dispense with Consent to Adoption*, 392 Mass. 738 (1984), the judge determined that he could not use any of the information contained in the hospital records. The judge concluded that the psychotherapist-patient privilege covered all the psychiatric information in hospital records, and none of the exceptions contained in the statute was applicable. That construction of the case is far too broad. In *Catholic Charitable Bureau*, we held that the exception to the psychotherapist-patient privilege statute contained in subsection (*e*) for child custody cases did not apply to a proceeding under G. L. c. 210, § 3.[14] *Id.* at

the child that the communication be disclosed than that the relationship between patient and psychotherapist be protected."

[13] Judges are exposed to privileged or otherwise inadmissible evidence everyday. That exposure does not taint their ability to decide cases. The judge could have examined the hospital records despite the claim of privilege. He simply could not rely on the privileged material in making his findings or in his conclusions. See *Petition of the Dep't of Social Servs. to Dispense With Consent to Adoption*, 397 Mass. 659, 672 (1986).

[14] In December, 1986, the child custody exception in the statute was amended. See St. 1986, c. 594. The exception contained in section (*e*) now provides: "In any case involving child custody, adoption or the dispensing with the need for consent to adoption in which, upon a hearing in chambers, the judge, in the exercise of his discretion, determines that the psychotherapist

740. In holding that the child custody exception to the privilege did not apply, we recognized that the government has many other sources of information available to it in a termination proceeding, including portions of the parent's hospital records which are admissible under G. L. c. 233, § 79. *Id.* at 743 n.6.

The psychotherapist-patient privilege grants to the patient the right to refuse to disclose, and to prevent another witness from disclosing, any communication between the patient and psychotherapist relative to diagnosis or treatment of a patient's mental condition. *Robinson* v. *Commonwealth, ante* 131, 133-134 (1987). The general policy of c. 233, § 20B, is to protect "the justifiable expectations of confidentiality that most individuals seeking psychotherapeutic treatment harbor." *Usen* v. *Usen*, 359 Mass. 453, 457 (1971), quoting *In re Lifschutz*, 2 Cal. 3d 415, 431 (1970). *Commonwealth* v. *Lamb*, 365 Mass. 265, 268 (1974). The scope of the privilege includes psychotherapist-patient "communications," which is defined as including "conversations, correspondence, actions and occurrences relating to diagnosis or treatment before, during or after institutionalization, regardless of the patient's awareness of such conversations, correspondence, actions and occurrences, and any records, memoranda or notes of the foregoing." See *Commonwealth* v. *Kobrin*, 395 Mass. 284, 289 (1985). While the scope of this privilege is broad, it does not cover all hospital records concerning nonpsychiatric admissions simply because some psychiatric information appears in the hospital record. The records are privileged if they contain the communications or notes of communications between the patient and a psychotherapist.[15]

has evidence bearing significantly on the patient's ability to provide suitable care or custody, and that it is more important to the welfare of the child that the communication be disclosed than that the relationship between patient and psychotherapist be protected; provided, however, that in such cases of adoption or the dispensing with the need for consent to adoption, a judge shall determine that the patient has been informed that such communication would not be privileged."

[15] The statute specifically defines "psychotherapist" as "a person licensed to practice medicine who devotes a substantial portion of his time to the practice of psychiatry or a person who is licensed as a psychologist by the board of registration of psychologists; provided, however, that such person has a doctoral degree in the field of psychology . . . ."

The hospital records admitted in evidence include two admissions for the prenatal care and birth of the two children and one admission for psychiatric care. We have reviewed the records. It appears that the hospital records concerning the prenatal care and birth of the children contain very little privileged material. See note 21, *infra*. Most of these records involve notes of the treating physicians and nurses, who are not "psychotherapists." Some notation concerning psychiatric data by nonpsychotherapist doctors and nurses does not require a conclusion that the entire hospital record is within the scope of G. L. c. 233, § 20B. See *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption*, 397 Mass. 659, 672 (1986) (judge confined his use of hospital records to evidence of the mother's medical condition and disregarded psychiatric records).

Turning to the case at bar, we repeat the judge's specific and detailed findings as to the unfitness of Mrs. B.[16] See *Custody of a Minor (No. 2)*, 392 Mass. 719, 725 (1984). *Custody of a Minor (No. 1)*, 377 Mass. 876, 886 (1979). The judge specifically found that she refused to cooperate with service plans, refused to continue therapy or medications, fired homemakers, refused visitation with the children, refused to undergo a court ordered psychiatric evaluation, refused all professional aid, and refused to see the guardian ad litem. The judge noted that when the parents had a substantial sum of money, they "quickly and unwisely dissipated" it. The parents and children have not seen each other for five years. This lengthy separation is due solely to the conduct of the parents. Because the department would not accede to the demands of the parents concerning visitation and custody, the parents have refused visitation with their children since 1981. Further, despite the need for prompt resolution of custody proceedings, see *Custody of a Minor*, 389 Mass. 755, 764 (1983), the parents have fired at least six attorneys, resulting in long continuances to permit their new

---

[16] The judge found that Mr. B has severe problems and could not, by himself, be considered a custodial parent. This finding is amply supported by the record, and is not contested. Therefore, we do not repeat the findings as to Mr. B.

attorneys to prepare the case. Refusal to see the guardian ad litem also involved further delays. The youngest child has never lived with his natural parents and he is now bonded to his foster parents. The judge also found that the daughter was not yet bonded to her foster family, although she appears to be doing well with this family and is in excellent health.[17]

The department offered extensive evidence relevant to the determination of the parents' unfitness.[18] Evidence such as the failure of the parents to keep a stable home environment for the children, the refusal of the parents to maintain service plans, visitation schedules, and counseling programs designed to strengthen the family unit are relevant to the determination of unfitness. *Care & Protection of Three Minors*, 392 Mass. 704, 713 & n.11 (1984). *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption*, 16 Mass. App. Ct. 965, 966 (1983). Further, the ability to manage financial affairs is also an appropriate consideration. 392 Mass. at 713 n.12.[19] Finally, "the lengthy separation of a mother and child and a corresponding growth in the ties between the child and a different custodian may in some circumstances indicate that the forced return of the child to the mother would be seriously detrimental to the child, with the result that the mother should be deemed not fit to care for the child." *Custody of a Minor*,

---

[17] The children are not living with the same foster family. Although both children were with the same family for some time, the daughter was removed from this family due to behavioral problems. The children remain in communication with each other.

[18] The department asks us to grant its petitions to dispense with consent for the adoption of the two children based on the strength of its case without the contested hospital records. We have set out most of the judge's findings of fact, see *supra* at 280-284, because those findings support the department's claim that it has a strong case without the hospital records. Nevertheless, the finding of parental unfitness is for the judge who sees and hears the witnesses. *Petitions of the Dep't of Social Servs. to Dispense with Consent to Adoption*, 389 Mass. 793, 802 (1983). Additionally, by the time the case comes before an appellate court, the information may be stale. Therefore, we deny the department's request that we grant the petitions.

[19] A finding of unfitness may not be based on a parent's financial condition. *Custody of a Minor*, 389 Mass. 755, 766 (1983). But the ability to maintain some financial stability may be relevant.

389 Mass. 755, 768 (1983). See *Custody of a Minor (No. 2)*, 392 Mass. 719, 725 (1984). Generally, no one factor is determinative[20] and the judge should weigh all the evidence.

On remand, the judge may assess the relevant, admissible information in the hospital records as well as the other evidence in reconsidering the petitions.[21] Because of the passage of time since the trial, more recent evidence may be necessary or helpful. The decision as to whether further evidence should be heard is for the judge.

Accordingly, the judgment is reversed and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

---

[20] The judge placed a great deal of emphasis on the fact that the older child appeared to be cared for, fed, and clothed during the ten months that she lived with her mother. Yet, it was also at this time that Mrs. B had received an inheritance of $23,000, which the judge found that she had "quickly and unwisely dissipated." The care the child received during the time with her parents may not be emphasized to the exclusion of all other evidence. The court should also look to the subsequent conduct of the parents in determining current fitness.

[21] The judge, in his findings, states that the department has not attempted to introduce the portions of the hospital records which are not privileged. Because the privilege belongs to the patient, it appears that the burden should be on the patient to assert the privilege. *Usen* v. *Usen*, 359 Mass. 453, 456 (1971). *Commonwealth* v. *Rexach*, 20 Mass. App. Ct. 919 (1985). Other privileges operate in this fashion. See *Commonwealth* v. *Simpson*, 370 Mass. 119 (1976) (self-incrimination); *Commonwealth* v. *Collett*, 387 Mass. 424 (1982) (social worker privilege); *District Attorney for the Plymouth Dist.* v. *Selectmen of Middleborough*, 395 Mass. 629 (1985) (attorney-client privilege).

We need not decide whether the patient has the burden to excise the privileged material because the department itself concedes that those communications which fall within § 20B should be excised. In our review of the records, there appear to be approximately twelve pages which are privileged in the New England Memorial Hospital records, most of which occur after Mrs. B's readmission. In the Brigham and Women's Hospital records, approximately ten pages are privileged and they are labeled "psychiatric note" or "psychiatric consult." That is how we read the hospital records, but the judge may make his own determination of the applicability of G. L. c. 233, § 20B. See note 13, *supra*. In any case, it is clear that a great portion of the hospital records is admissible without regard to § 20B.