The father of Kadim (born in 2014) and Julia (born in 2016) appeals from Juvenile Court decrees terminating his parental rights to both children and leaving visitation in the discretion of the adoptive parents, the children's maternal grandparents. We affirm.
Discussion. "In determining whether to dispense with parental consent to adoption, a judge must 'evaluate whether the [parent is] able to assume the duties and responsibilities required of a parent and whether dispensing with the need for parental consent will be in the best interests of the children.' " Adoption of Nancy, 443 Mass. 512, 514 (2005), quoting Adoption of Mary, 414 Mass. 705, 710 (1993). See G. L. c. 210, § 3 ; Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012). The judge must conduct a two-part analysis: the judge must first determine "parental unfitness by clear and convincing evidence," and "[a]fter ascertaining unfitness, the judge must determine whether ... it would be in the child's best interests to end all legal relations between parent and child." Adoption of Nancy, 443 Mass. at 515. The two inquiries "are not separate and distinct, but 'reflect different degrees of emphasis on the same factors.' " Id., quoting Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption, 367 Mass. 631, 641 (1975). "We give substantial deference to a judge's decision that termination of a parent's rights is in the best interest of the child, and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Ilona, 459 Mass. 53, 59 (2011).
The judge concluded that the father's persistent problems with domestic violence, substance abuse, criminal activity, lack of stable employment, and lack of stable housing rendered him an unfit parent, and that these shortcomings would continue unabated in the future. The father contends that the judge erred by crediting the mother's testimony against him; that several of the judge's subsidiary findings are clearly erroneous, undermining her ultimate conclusion; and that the judge abused her discretion by declining to order postadoption visitation.
1. The mother's credibility. The father contends the judge erred in crediting the mother's testimony against him, particularly her accounts of domestic violence, because the mother had strong motivation to lie. Specifically, just before trial the mother agreed to an open adoption agreement with the maternal grandparents that allowed her visitation with the children; this agreement could not go into effect until the judge terminated the father's parental rights.
The judge did not ignore the father's argument, which was fully aired at trial. The attorney from the Department of Children and Families (DCF) informed the judge of the agreement, the mother testified about the agreement, and the judge discussed the agreement during a colloquy with the mother. The father's trial counsel argued in his opening statement that the mother was motivated to lie and pressed the point during cross-examination of the mother.
The judge acknowledged in her conclusions of law that "there were times Father and Mother denied any domestic violence," but concluded domestic violence was nonetheless a factor because "there were countless previous incidents" in the record. The judge's decision to credit the mother's testimony indicates that the father's argument was not persuasive. "We accord the credibility determinations of the judge who 'heard the testimony of the parties ... [and] observed their demeanor' ... the utmost deference." Ginsberg v. Blacker, 67 Mass. App. Ct. 139, 140 n.3 (2006), quoting Pike v. Maguire, 47 Mass. App. Ct. 929, 929 (1999). The judge was not obligated to disbelieve the mother's testimony. See Care & Protection of Three Minors, 392 Mass. 704, 711 (1984).
2. Challenged findings of fact. The father claims that several of the judge's subsidiary factual findings underlying her ultimate conclusion of parental unfitness are clearly erroneous.[3] He also contends that the judge's findings concerning domestic violence and substance abuse could not be used to establish his unfitness because the judge did not find that these behaviors adversely affected the children.
Parental unfitness "means more than ineptitude, handicap, character flaw, conviction of a crime, unusual life style, or inability to do as good a job as the child's ... parent. Rather, the idea of parental unfitness means grievous shortcomings or handicaps that put the child's welfare much at hazard" (footnotes and quotation omitted). Adoption of Katharine, 42 Mass. App. Ct. 25, 28 (1997). "Violence of temper, indifference or vacillation of feeling toward the child, or inability or indisposition to control unparental traits of character or conduct, might constitute unfitness. So, also, incapacity to appreciate and perform the obligations resting upon parents might render them unfit." Guardianship of a Minor, 1 Mass. App. Ct. 392, 396 (1973).
Relevant to a determination of unfitness is the parent's inability to "keep a stable home environment for the children" and "manage financial affairs." Petitions of the Dep't of Social Servs. to Dispense with Consent to Adoption, 399 Mass. 279, 289 (1987). The presence of violence within a family is also "highly relevant to a judge's determination of parental unfitness and the best interests of the children." Adoption of Gillian, 63 Mass. App. Ct. 398, 404 n.6 (2005). "[P]hysical force within the family is both intolerable and too readily tolerated, and ... a child who has been either the victim or the spectator of such abuse suffers a distinctly grievous kind of harm." Custody of Vaughn, 422 Mass. 590, 595 (1996).
While the parent's behavior must be causally connected with a child's endangerment, the judge need not be "confronted with a maltreated child before deciding care and protection are necessary," and may consider past conduct as predictive of "the likelihood of harm to the child." Custody of Two Minors, 396 Mass. 610, 620-621 (1986).
Before terminating parental rights, the judge must "make specific and detailed findings, demonstrating that close attention has been given to the evidence." Adoption of Gregory, 434 Mass. 117, 126 (2001). The judge's subsidiary findings of fact must be supported by a preponderance of the evidence and will not be disturbed unless clearly erroneous. Id. A subsidiary finding is clearly erroneous when there is no evidence to support it, or when, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Custody of Eleanor, 414 Mass. 795, 799 (1993), quoting Building Inspector of Lancaster v. Sanderson, 372 Mass. 157, 160 (1977).
a. Domestic violence. The mother's testimony and exhibits admitted at trial amply support the judge's conclusion that the father had a history of domestic violence. Specifically, the judge cited numerous G. L. c. 119, § 51B, investigations documenting incidents of domestic violence and two G. L. c. 209A abuse prevention orders the mother obtained against the father. This evidence, along with other record evidence that the judge did not specifically mention, support the conclusion that the father had a history of violence toward the mother.
The father's domestic violence was also sufficiently connected to his parental unfitness. Although the judge's findings do not address the effects of the father's violence on the children with great specificity, the record indicates the father was violent toward the mother in front of Julia. An exhibit admitted at trial demonstrated that on separate occasions the father attempted to strangle the mother and threatened her with a knife while she was holding Julia. The father's violence toward the mother in Julia's presence supports the judge's conclusion of parental unfitness. See Opinion of the Justices, 427 Mass. 1201, 1203 (1998) ; Custody of Two Minors, 396 Mass. at 620-621 ; Adoption of Bianca, 91 Mass. App. Ct. 428, 433-434 (2017).
b. Substance abuse. The record also supports the judge's findings concerning the father's history of substance abuse. There was evidence that the father tested positive for marijuana on the first day of trial, used unprescribed Percocet for years, and used heroin to the point of overdosing. The record also contains strong evidence that the father was a heavy drinker. His criminal record includes two convictions for operating a motor vehicle under the influence of alcohol (OUI).
The father's substance abuse adversely affected his fitness as a parent. The father's OUI convictions led to the loss of his driver's license for three years, which severely impaired his ability to commute to work in the rural area in which he lived. The OUI convictions also led to his incarceration: he twice violated his probation, once by refusing a breathalyzer test and once by getting in a bar fight. The judge could properly conclude that the consequences of the father's substance abuse undermined his ability to care and provide for the children.
c. Drinking around Kadim. The father claims the judge erroneously found that the father drank beer around Kadim prior to his removal. The judge's actual finding was as follows: "Father denied drinking around {Kadim] prior to removal, but that he would drink beer once or twice a week when he was by himself. The court does not credit this testimony, in fact, the court credits Mother's testimony, the exhibits and the testimony of [a social worker]." The judge did not specifically find that the father drank in Kadim's presence. The record does support the judge's conclusion that the father drank more heavily than he admitted. We are not left with a "definite and firm conviction that a mistake has been committed." Custody of Eleanor, 414 Mass. at 799.
d. Suspension from the union. The father next challenges the judge's finding that he was suspended from the labor union he belonged to, which provided him work opportunities. The father contends the judge should have credited the testimony of the union's business manager, Ronald Holmes, that Holmes could find the father a job within a week.
The evidence supports the judge's finding. Two documents in the record indicate that the father was suspended from the union, and Holmes never testified that this was not the case. Indeed, one of the two documents is a fax that Holmes sent to an employer a few months after Julia's removal with the notation "suspended member" in the description field. The judge was not obliged to accept Holmes's testimony that he could find the father a job easily. See Care & Protection of Three Minors, 392 Mass. at 711. As the union affiliation provided him employment, the father's suspension impeded his ability to provide for the children.
e. Back rent. The father also assails the judge's finding that the father failed to use funds from his unemployment checks to pay back rent. The father further contends that the judge confused the source of these funds, conflating the unemployment income he began receiving a few months before trial with the income he had previously earned.
The judge found it "concerning" that the father was evicted for nonpayment of rent "considering Father's substantial weekly income when he was employed." While the record does not clearly distinguish among the sources of the father's income, the judge's findings make clear that what mattered was the father's decision not to pay back rent, not the precise source of the funds he could have used. Even if the judge mischaracterized the source of the funds, the record supports her finding that the father did not pay back rent when he could have. The father's failure to provide stable housing for himself, and consequently for the children, supports the judge's determination of unfitness. See Petitions of the Dep't of Social Servs. to Dispense with Consent to Adoption, 399 Mass. at 289.
f. Family's lack of benefit from father's employment. The father next challenges the judge's finding that "[b]y his own words the family did not benefit" from the father's employment as a construction supervisor at the Massachusetts Museum of Contemporary Art (MOCA). The father contends that the judge mischaracterized his testimony, and that he in fact provided health insurance and financial support for the mother and Julia when he was employed by MOCA.
This finding is not clearly erroneous. The judge was referring to the father's testimony that rather than pay back rent to keep his apartment, he paid bills for the "snowmobiles, dirt bikes, [and] trucks" he had "irresponsibl[y]" purchased for himself. The father does not dispute that this choice resulted in eviction. While the father provided some financial support for the mother and Julia (but not for Kadim), the judge could properly conclude that on balance the father's spending decisions resulted in the family's not benefiting from his employment.
3. Visitation decision. Finally, the father argues the judge abused her discretion by refusing to order posttermination and postadoption visitation. The father contends the judge should have ordered visitation because DCF recommended one to two visits per year, the father's prior visits went well, and the adoptive parents wrongfully prevented visitation in the past.
"[A] judge who finds parental unfitness to be established has broad discretion to determine what is in a child's best interests with respect to custody and visitation with biological family members thereafter." Adoption of Rico, 453 Mass. 749, 756 (2009). A judge must balance the benefit of an order of visitation with the intrusion that such an order imposes on adoptive parents, "who are entitled to the presumption that they will act in their child's best interest." Adoption of Ilona, 459 Mass. at 64-65.
The judge did not abuse her discretion. While DCF recommended one or two visits per year, the judge was not bound by that recommendation. Moreover, the judge had valid reasons for declining to order visitation. The father's visitation was inconsistent. While the father visited Julia monthly, he canceled a recent visit so that he could attend a concert. The judge found the father's choice "is informative ... as to Father's priorities and lack of understanding of his children's needs." The father had not visited Kadim for approximately seven months before the trial. Although the father informed the court investigator that he had a "good relationship" with his children, the record does not demonstrate a strong bond between the father and the children. In contrast, the judge found the children had formed strong emotional bonds with the adoptive parents, with whom they have lived since they were each three months old -- a finding the father does not challenge.
Finally, the record does not support the father's claim that the adoptive parents wrongfully denied the father visitation. The adoptive mother ended visits with the children in her home only after the father verbally abused her, but visits continued for a time at the YMCA.
The father's evidence did not overcome the presumption that the adoptive parents would act in the children's best interests. The judge did not abuse her discretion in declining to order visitation. See Adoption of Ilona, 459 Mass. at 64-65 ; Adoption of Rico, 453 Mass. at 756.
Decrees affirmed.

The father contends that some of these findings also suffer from the judge's acceptance of the mother's testimony, notwithstanding the mother's motive to lie. We addressed this argument in part 1, supra, and need not discuss it further.