NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-224

ADOPTION OF ARMAND (and a companion case[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The father appeals from decrees issued by a judge of the Juvenile Court finding him unfit and terminating his parental rights to his sons, Armand and Benjamin (the children).[2] The father also challenges the decrees approving the adoption plan for Benjamin and denying the father posttermination and postadoption visitation with the children. We affirm in part, vacate in part, and remand for further proceedings.

Background. We summarize the judge's findings of fact, supplemented by uncontroverted evidence from the record. The father's daughter (daughter), the children's sister, was born in 2004. Armand was born in 2009, and Benjamin was born in 2012. In 2004, the Department of Children and Families (department) received the first of numerous G. L. c. 119, § 51A reports (51A

---

[1] Adoption of Benjamin. The children's names are pseudonyms.
[2] The father's eldest child, a daughter, turned eighteen shortly after the trial. She is not a subject of this appeal.

reports) related to the family. The department initially became involved with the family due to concerns about domestic violence between the parents and substance abuse by the father. The case remained open until 2005, when the mother obtained a restraining order against the father, whose location was then unknown to the department. In 2010, a 51A report was filed due to concerns of domestic violence and substance abuse by the father, and the case again closed when the mother obtained a restraining order against the father. In all, the mother has obtained eight restraining orders against the father.

In 2012, on a day that the father had kicked her in the face, the mother had a stroke. Due to the stroke, the mother could not use the left side of her body, so she was unable to care for the children. In August 2014, the father left the children at the mother's house unsupervised. Because the mother did not have custody of the children, she did not allow the department's investigator into her home, though she noted that the father had previously left the children with her for nine days.

In October 2015, a department investigator visited the family's home following a report alleging neglect because Armand was not attending school, and the daughter did not have school uniforms. The father told the investigator that he struggled to meet the children's needs. Later that month, Benjamin attended

2

school with burns on his hand, including "blisters all over the inside . . . of his hand."  Benjamin had spilled hot water from the dishwasher on his hand, causing second-degree burns.  In November 2015, the father did not pick up Armand, then age six, from school.  Over two and one-half hours after dismissal, a truant officer went to the home, where no one was present.  Later that day, the investigator went to the home and found the father chasing Benjamin.  When notified that he did not pick up Armand after the school's early dismissal, the father began to cry.  The department supported the allegations of neglect.

In September 2017, while the family lived at a motel, the daughter had a high fever and was taken to a hospital, where she repeatedly told staff that she and the father were demons.  The daughter said that the father hit her and caused a bruise on the inside of her lip.  Both Benjamin and a bystander said that they saw the father hit the daughter in the face.  The bystander said the father slapped the daughter across the face, leaving a handprint and a bruise.

In October 2017, three police officers responded to a call for a well-being check at a different motel where the family lived.  The woman who called the police reported that she believed drug use and prostitution were occurring in the room while the children were present.  She later explained to a department social worker that she saw a woman "passed out" on

3

the bathroom floor with a small bag that she knew to be used as a "drug bag." When the officers arrived, no women were present in the room. The officers found six to ten empty nip bottles, which the father said belonged to the caller. The father indicated he did nothing wrong, saying that the women were a "booty call," and he had invited two of them so that he could have a "back-up plan."

A week later, the department conducted an emergency removal of the children, who were moved to a foster home with their maternal aunt. Armand suffered from speech delay, and he assaulted a department social worker who attempted to interview him. When interviewed by the department about two weeks later, Armand said that he did not want to live with his father again. During this period, Benjamin wet and soiled himself at school daily, suffered speech delay, and was on an individualized education program. A school counselor also reported that Benjamin was defiant and emotional.

After the children's removal, the father moved to Maine. He did not meet his obligations under his action plan, visited the children only sporadically, and missed several scheduled visits. The department attempted several times to contact the father, but he did not answer his phone. The father did not sign releases to allow the department to verify his participation in services on his action plan, and he did not

4

verify that he was sober or employed.  After about three months without contact, the father met with his department social worker for an office visit in September 2018.  Between November 2018 and September 2019, the father did not consistently update the department with his address, and he still had not signed the releases.  In December 2021, the father's address remained unknown, he refused to sign releases or provide his address, and he had not visited the children in a year.

The father neither participated in the October 2017 temporary custody hearing nor the March 2022 trial.[3]  Following trial, the judge found the father unfit, adjudicated the children to be in need of care and protection, and terminated the father's parental rights to them.

Discussion.  1.  Termination of parental rights.  "To terminate parental rights to a child and to dispense with parental consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests" (citation omitted).  Adoption of Oren, 96 Mass. App. Ct. 842, 844 (2020).  "[T]he 'parental fitness' test and

_____

[3] On the date of trial, the seventeen year old daughter lived at an intensive residential treatment program for traumatized youth, and she had no desire to see her father.

5

the 'best interests of the child test' are not mutually exclusive, but rather 'reflect different degrees of emphasis on the same factors.'" Adoption of Garret, 92 Mass. App. Ct. 664, 671 (2018), quoting Care & Protection of Three Minors, 392 Mass. 704, 714 (1984). In making a best interests determination, the judge considers "'the ability, capacity, fitness and readiness of the child[ren]'s parents' as well as 'the plan proposed by [the department].'" Adoption of Garret, supra at 675, quoting Adoption of Nancy, 443 Mass. 512, 515-516 (2005).

The parent's fitness is "determined by taking into consideration a parent's character, temperament, conduct, and capacity to provide for the child in the same context with the child's particular needs, affections, and age." Adoption of Mary, 414 Mass. 705, 711 (1993). "The inquiry is whether the parent's deficiencies 'place the child at serious risk of peril from abuse, neglect, or other activity harmful to the child'" (citation omitted). Adoption of Olivette, 79 Mass. App. Ct. 141, 157 (2011). "We give substantial deference to a judge's decision that termination of a parent's rights is in the best interest of the child, and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Ilona, 459 Mass. 53, 59 (2011).

6

a. The judge's findings. "Unless shown to be clearly erroneous, we do not disturb the judge's findings, which are entitled to substantial deference." Adoption of Jacques, 82 Mass. App. Ct. 601, 606-607 (2012). "A finding is clearly erroneous when there is no evidence to support it, or when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed" (quotation and citation omitted). Adoption of Larry, 434 Mass. 456, 482 (2001). "We accord deference to a trial judge's assessment of the credibility of witnesses and the weight of the evidence." Adoption of Olivette, 79 Mass. App. Ct. at 157.

The father argues that the judge made a number of erroneous findings, including those related to his compliance with his action plan, physical abuse of the mother and the daughter, abandonment of the children, engagement in sexual acts in the children's presence, and alcohol use. We conclude that most of the challenged findings are supported by the record.

Notwithstanding the father's argument to the contrary, the evidence supports the judge's finding that the father failed to participate in counseling designed to address his alcohol use. Over four years after alcohol counseling and attaining sobriety first appeared on the father's action plan, the department could

7

not verify that he engaged in any counseling services or remained sober.

The father's contention that the judge erred by relying on the daughter's hearsay statements to find that he physically abused her is likewise unavailing.  Hearsay contained within the department's reports and official records that does not fall within an existing exception is admissible to establish primary facts if the hearsay source is specifically identified in the document and available for cross-examination.  See Adoption of Luc, 484 Mass. 139, 152-153 (2020).  The daughter's statements that the father hit her were contained in multiple G. L. c. 119, § 51B reports.

The judge also did not err in her conclusion that physical abuse was an "ongoing concern," even though the mother had not obtained a restraining order against him since before Benjamin's birth.  Although one 51A report indicated that the father completed a court-ordered domestic violence class, the department's social worker testified that the father had done nothing to resolve the issue.  Regardless, the judge concluded that the father had a well-documented, "significant history" of domestic violence.  While the mother's eight restraining orders against the father "cannot be the basis for a finding of current parental unfitness[,]" his "history . . . has prognostic value"

(citation omitted).  Adoption of Jacques, 82 Mass. App. Ct. at 607.

The father further contends that the judge erred by finding that he had "all but abandoned his children."  Reading this statement as a shorthand way of summarizing the judge's more specific findings about the father's limited visitation and failure to participate in action plan services intended to build stronger ties between the father and the children,[4] we are not persuaded that the statement was clearly erroneous.

We do agree with the father that a minute portion of the challenged findings lacked support.  Specifically, and as the department concedes, whatever the father's intent may have been, he did not engage in sexual acts in the children's presence, and any finding to that effect was clearly erroneous.  Additionally, although there is ample support for the judge's findings that the father had been drinking at the time of multiple 51A reports, the record does not support the judge's finding, even assuming one was made, that the father had been "drinking heavily" on the night in September 2017 that he slapped the daughter in the face.  Where the remaining 229 findings the

---

[4] It is apparent from the judge's determination that G. L. c. 210, § 3 (c) (i) did not apply that the judge did not find that the father had "abandoned" the children, as the father claims.

judge made establish the father's unfitness by clear and convincing evidence, however, we are not persuaded that the erroneous findings warrant reversal.  See Adoption of Jacques, 82 Mass. App. Ct. at 606-607 (articulating standard of review).

b.  The father's unfitness.  The father's unfitness resulted from a "constellation of factors."  Adoption of Greta, 431 Mass. 577, 588 (2000).  The father did not provide a stable home environment for the children, nor did he "maintain service plans, visitation schedules, and counseling programs designed to strengthen the family unit."  Petitions of the Dep't of Social Servs. to Dispense with Consent to Adoption, 399 Mass. 279, 289 (1987).  Despite the department's intervention, the father failed consistently to participate in services and treatment to address the issues that caused the removal of the children.  See Adoption of Serge, 52 Mass. App. Ct. 1, 8 (2001) ("The mother's lack of meaningful participation in recommended services was . . . relevant to the question of her fitness").  To the extent that the father did engage in services, the judge found that the father benefited from the services little, if at all.  See Adoption of Ulrich, 94 Mass. App. Ct. 668, 677 (2019), quoting Petitions of the Dep't of Social Servs. to Dispense with Consent to Adoption, supra (parent's failure to benefit from services "relevant to the determination of unfitness").

10

We discern no abuse of discretion in the judge's determination that the father's unfitness would persist, and therefore termination of his rights was in the children's best interests.  See Adoption of Cadence, 81 Mass. App. Ct. 162, 169 (2012) ("Where there is evidence that a parent's unfitness is not temporary, the judge may properly determine that the child's welfare would be best served by ending all legal relations between parent and child").  During the children's lifetimes, the father exposed them to instability, inappropriate caretakers, verbal abuse, and physical harm.  While they were in his custody, the children did not attend school regularly and often appeared dirty and disheveled.  We agree with the judge's determination that the father failed to take steps to ameliorate the neglectful conditions that have harmed the children.

2.  Adoption plan for Benjamin.  "The law does not require that the adoption plan be 'fully developed' in order to support a termination order, but it must provide 'sufficient information about the prospective adoptive placement so that the judge may properly evaluate the suitability of the department's proposal'" (quotation omitted).  Adoption of Varik, 95 Mass. App. Ct. 762, 770 (2019), quoting Adoption of Willow, 433 Mass. 636, 652 (2001).  "[T]he judge may consider evidence and testimony presented at trial regarding unfitness and the child's best interests, in addition to the written plan."  Adoption of Varik,

11

supra at 770.  A "judge considering an adoption plan must make specific findings reflecting careful evaluation of the suitability of [the department's] proposal" (citation omitted).  Adoption of Imelda, 72 Mass. App. Ct 354, 361 (2008).  The department's plan must be "sufficiently detailed to permit the judge to evaluate the type of adoptive parents and home environment proposed and consider whether the proposal is best suited to meet the specific needs of the child."  Adoption of Varik, supra at 770-771.

The father contends that the department's adoption plan was not fully developed because it did not sufficiently identify the characteristics of an adoptive family, and because Benjamin was not yet in a preadoptive placement.[5]  The judge found that Benjamin has "substantial needs that will require extraordinary attentiveness and active engagement by [his] caretakers."  It was unclear whether the father had a home, a job, or a willingness to work with the department "to assist him with understanding and providing for [Benjamin's] significant

---

[5] The father also asserts that Benjamin's adoption is precluded by the department's agreement with the mother not to terminate her parental rights.  While it is true that Benjamin will not be free for adoption while the mother maintains her parental rights to him, the father has not convinced us that this fact has any impact on the propriety of the judge's termination of his parental rights to Benjamin.  More specifically, the father has not provided us with any support for the proposition that in the circumstances here, the judge could not approve an adoption plan prospectively.

12

requirements for stability, consistency, and therapeutic interventions."

The department accordingly planned to recruit an appropriate adoptive family. However, the department's adoption plan did not include any "information describing the kind of home environment and adoptive family makeup that ideally would best meet [Benjamin's] particular needs." Adoption of Varik, 95 Mass. App. Ct. at 771. Although the plan included some details of Benjamin's medical and placement histories, these details were "not a substitute" for a description of the ideal home environment. Id. Contrast Adoption of Xarissa, 99 Mass. App. Ct. 610, 622-623 (2021) (adoption plan sufficiently detailed where child's issues were "in flux" and plan "extensively detailed" child's mental and behavioral needs and treatment history). Further, the social worker who submitted the plan did not significantly expand on the plan at trial. Although the adoption plan for Benjamin was inadequate, "we may remand the matter for further proceedings with regard to the department's proposed adoption plan without vacating the portion of the decree that terminates the father's rights." Adoption of Varik, supra at 774.

3. Parental visitation. "In terminating parental rights pursuant to G. L. c. 210, § 3, the Juvenile Court judge has the equitable authority to order visitation between a child and a

13

biological parent where such contact is in the best interests of the child." Adoption of Garret, 92 Mass. App. Ct. at 679. "Whether such contact in any given case is wise is a matter that should be left to the discretion of the judge." Youmans v. Ramos, 429 Mass. 774, 783 (1999). "A judge should issue an order of visitation only if such an order, on balance, is necessary to protect the child's best interest." Adoption of Ilona, 459 Mass. at 65. A judge should consider "whether a preadoptive family has been identified and . . . whether the child 'has formed strong, nurturing bonds' with that family." Id. at 64, quoting Adoption of Rico, 453 Mass. 749, 754 (2009).

Here, the judge found that the father did not consistently visit the children or engage in action plan tasks that might reunite him with the children. Further, the father was offered monthly visits with the children, but he did not consistently attend them. During a February 2022 visit with the father, the children appeared uncomfortable, avoided eye contact, and did not engage in conversation with him. The judge found that mandated visitation was not in the children's best interests. See Adoption of Edgar, 67 Mass. App. Ct. 368, 371 (2006) (purpose of posttermination visitation is assisting child's transition, not strengthening bond between child and biological parent). We are satisfied that the judge carefully weighed the evidence and thus did not abuse her discretion by declining to

14

make a specific order of visitation.  See <u>Youmans</u>, 429 Mass. at 783.

Conclusion.  With regard to Benjamin, we vacate that portion of the decree approving the department's adoption plan and remand this matter for further proceedings so that the judge may promptly, after an evidentiary hearing, if necessary, consider an adequate adoption plan.  In all other respects, the decrees as to the children are affirmed.

<u>So ordered</u>.

By the Court (Hand, Hershfang & Brennan, JJ.[6]),

Anne M. Thomas
Assistant Clerk

Entered:  February 15, 2024.

---

[6] The panelists are listed in order of seniority.