NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-39

ADOPTION OF CEILIA (and a companion case[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

After a trial, a judge of the Juvenile Court found the mother unfit to parent her children, Ceilia and Jane, terminated her parental rights to both children, and concluded that adoption of the children by their preadoptive foster parent was in their best interests. On appeal, the mother claims the judge abused her discretion by failing to properly consider the mother's plan of kinship guardianship. The mother also appeals from the trial judge's denial of a motion for relief from judgment and a new trial, arguing the judge abused her discretion in finding there were no extraordinary circumstances warranting a new trial. We affirm.

---

[1] Adoption of Jane. The children's names are pseudonyms.

1.  Background.  We summarize the judge's findings of fact, reserving certain details for later discussion.[2]  Ceilia was born in December 2018 and Jane in December 2019.  Between December 2019 and January 2020, the Department of Children and Families (DCF) received five reports under G. L. c. 119, § 51A (51A reports), alleging neglect of the children.  First, in December 2019, a 51A report was filed, and subsequently supported by DCF, alleging the mother tested positive for marijuana while pregnant.  DCF's investigation revealed the mother was using marijuana to cope with the murder of the children's father.  DCF found that the children's needs were being met, and the children remained in the mother's care.

In January 2020, four 51A reports were filed, three of which were supported by DCF, alleging neglect of the children by the mother and her then boyfriend. Of note, one January 2020 51A report, which was supported by DCF, alleged the mother had medically neglected the children.  The children's pediatrician reported the mother had not attended several of the children's medical appointments and follow-up visits.  When the mother did attend appointments, she and the children emitted such a strong

_____

[2] The trial judge made 216 "specific and detailed" findings and forty-two conclusions of law in support of her decision to terminate the mother's parental rights, and the findings "demonstrate that close attention has been given the evidence." Custody of Eleanor, 414 Mass. 795, 799 (1993).

cannabis odor that the medical room had to be aired out prior to reuse. Concerning Ceilia, the mother did not attend an appointment for the child's hip dysplasia, nor could it be confirmed that Ceilia was in a Pavlick harness as required to address the condition. With respect to Jane, the pediatrician expressed concerns with her "inconsistent . . . feeding schedule."

As a result, DCF filed a care and protection petition and obtained temporary custody of both children in January 2020. The mother subsequently waived her right to a temporary custody hearing, and DCF retained temporary custody of the children. DCF then implemented an action plan for the mother to work towards reunification with the children. The action plan required the mother to address concerns pertaining to her parental fitness, including exposure to violence, unstable and unsafe housing, domestic violence, marijuana use, and mental health.

a. The mother's unfitness. At trial, the mother stipulated to her temporary parental unfitness and acknowledged the risk of harm to the children emanating from the violence around her. In fact, the mother's life was often endangered by encounters with violent individuals from 2019 through March 2022. In March 2019, she fled her apartment after three men came to her door with a gun looking for another man. In May

2019, the children's father was stabbed and killed while the mother and Ceilia were present. In January 2020, individuals threatened to take the mother's belongings while in her home. In March 2020, armed individuals entered her home looking for money and attempted to drag her boyfriend from the apartment. In July 2020, the mother's new boyfriend was involved in a drive-by shooting outside her apartment. Following the shooting, police recovered two handguns and numerous rounds of ammunition from a safe in the mother's apartment; the safe also contained records personal to the mother. In January 2021, police found a gun magazine and shell casings in the mother's living room. In April 2021, police responded to her address for reports of a "gunshot victim," and encountered the victim of an apparent self-inflicted gunshot wound. At trial in May 2022, the mother testified she was likely to be murdered. Despite the danger facing the mother, she minimized her involvement in the violence, claiming not to have knowledge of any of these incidents while continuing to associate with the individuals involved.

The violence around the mother contributed to her inability to obtain safe and stable housing. In her prior housing, as detailed above, the mother was subjected to a violent home invasion by individuals familiar to her and her then boyfriend, she acquiesced to others storing firearms and ammunition, and

4

her home was the site of active gunfire.  The mother recognized her residences have not been safe living environments for her children, but at the start of trial in May 2022, two and one-half years after DCF was granted custody of the children, she had not taken any steps to obtain safer housing.

The mother also minimized domestic violence in her home by the father and a former boyfriend.  Domestic violence between the father and the mother was common, and in a "really bad" incident of abuse by the father in 2014, the mother "ended up with two black eyes and a bloody nose."  At trial, she blamed herself for provoking him.  Moreover, the mother did not adequately engage in domestic violence services as required by her DCF action plan.  The mother signed up for individual classes with a domestic violence treatment center, but she did not verify her completion of the individual classes nor did she provide DCF with evidence that she engaged in group classes. The mother also did not demonstrate insight into how domestic violence impacted her children.  She repeatedly entered into relationships with violent men and did so at the expense of creating an unsafe living environment for the children.

The mother also has a history of anxiety and depression and had not adhered to DCF's action plan to address these challenges.  She was inconsistent with therapy, stopped taking prescribed medication, and did not complete a substance abuse

evaluation. The mother's unprescribed use of marijuana caused her psychiatrist to take her off other medication to avoid her "double prescribing" herself.

Citing the mother's exposure to violence, inability to provide a stable and safe home environment, exposure to and minimization of domestic violence, untreated mental health concerns, and failure to comply with DCF's action plan and be honest with DCF, the judge found the mother's unfitness to parent the children was likely to continue into the indefinite future.

b. Placement plans. After obtaining temporary custody of the children, DCF initially evaluated kinship placements with the paternal grandmother, paternal aunt, and mother's stepmother (maternal step-grandmother). Following the mother's stipulation to her temporary unfitness at trial, the judge considered two primary placement plans: guardianship with the maternal step-grandmother, the mother's proposed plan; and adoption by the children's current foster mother, DCF's proposed plan.

The judge found DCF's plan to be in the children's best interests. In support, the judge noted the children's strong bond with the foster mother and the nurturing environment of her home. Both children identified the foster mother as "mom," sought her out for comfort, and as of the start of trial in May

2022, had been living with her for most of their lives.[3]  The foster mother ensured both children were meeting developmental milestones through early intervention and maintained the children's medical appointments.  Ceilia began taking supplements to treat her anemia and Jane, who previously had poor weight gain, became on track to achieve a healthier weight.

Regarding the mother's placement plan, the judge expressed concerns that the maternal step-grandmother, who owned a construction company, lacked the time and ability to care for Ceilia and Jane in addition to her own seven children.  The maternal step-grandmother testified that she and her older children would work together to care for Ceilia and Jane.  However, the maternal step-grandmother had not made a substantial effort to visit the children while they were in DCF care, only first visiting them around seven to eight months after their placement, and there was no evidence that her children knew Ceilia and Jane.  Further, the judge did not credit the maternal step-grandmother's testimony that she attended follow-up early intervention appointments with Ceilia and found her to be evasive when discussing her prior history with DCF.

---

[3] Ceilia had lived with the foster mother since February 2020, when she was around fourteen months old, and Jane was placed with the foster mother around the same time when she was less than two months old.

7

2. Discussion. a. Placement. After a determination of parental unfitness, the judge is required to assess all placement plans for the children and "determine which placement will serve the best interests of the child." Adoption of Dora, 52 Mass. App. Ct. 472, 474-475 (2001). The judge's assessment of each plan must be "even handed," regardless of which party offered the plan. Adoption of Hugo, 428 Mass. at 226 n.8 (1998), cert. denied sub nom. Hugo P. v. George P., 526 U.S. 1034 (1999). We review the judge's assessment for abuse of discretion. See Adoption of Bianca, 91 Mass. App. Ct. 428, 434 (2017).

The mother argues the judge abused her discretion by not appropriately considering DCF regulations regarding the priority of kinship placements. This issue was not raised below and is therefore waived. See Adoption of Willow, 433 Mass. 636, 651 (2001).

Even if the issue was not waived, the judge acted within her discretion in considering and rejecting kinship placement options. Judges are entitled to deference when they assess the credibility of witnesses and weigh evidence. See Petition of Dep't of Social Servs. to Dispense with Consent to Adoption, 397 Mass. 659, 670 (1986). Here, the judge's assessment that the maternal step-grandmother was not a credible witness contributed to the judge's other concerns about the maternal step-

8

grandmother's ability to care for the children.  Moreover, after thoroughly considering all the evidence, the judge found the children were thriving in their foster home and had already established a strong bond with their foster mother that exceeded their bond with the maternal step-grandmother.  The judge was therefore within her discretion in concluding placement with the foster mother was in the best interests of the children.

b.  <u>Denial of motion for relief from judgment</u>.  In termination of parental rights cases, a judge reviewing a motion filed pursuant to Mass. R. Civ. P. 60 (b), 365 Mass. 828 (1974),[4] must decide whether posttrial events amount to "extraordinary circumstances . . . [suggesting] that modification of the decree would serve the child's best interests."  <u>Adoption of Cesar</u>, 67 Mass. App. Ct. 708, 716 (2006).  "A judge's denial of . . . a rule 60(b) motion is within her discretion and is entitled to great deference by a reviewing court."  <u>Adoption of Gillian</u>, 63 Mass. App. Ct. 398, 411 (2005).  We give special deference to the decision of a judge who, as here, was also the trial judge.  See <u>Commonwealth</u> v. <u>Figueroa</u>, 422 Mass. 72, 77 (1996).  The decision "will not be reversed on appeal except on a showing, by

_____

[4] "We look to rule 60(b) by analogy and as a cogent standard because the Massachusetts Rules of Civil Procedure do not apply to proceedings to dispense with consent to adoption."  <u>Adoption of Rory</u>, 80 Mass. App. Ct. 454, 455 n.3 (2011).

9

clear and convincing evidence, that the judge abused her discretion."  Adoption of Gillian, supra.

One month after the trial concluded, in August 2022, the mother moved to a family shelter approximately ninety miles away from her prior residence.  In January 2023, the mother gave birth to her third daughter.  In an affidavit provided by the mother, the family shelter's director provided support for the mother's motion.  The director reported, inter alia, that the mother had been compliant with shelter rules and had demonstrated that she was a nurturing mother to her new daughter.  The director also endorsed the mother's ability to parent her other children should they be returned to her care while in the shelter.

The mother argues the judge abused her discretion denying her motion for relief from judgment and for a new trial because she had sufficiently resolved her unstable and dangerous living environment (and was parenting an infant) "mere months" after the trial concluded.  She contends the instability and violence in her living environment were the primary reasons she was found unfit and therefore her relocation warrants a new trial.  We disagree.  The judge found the mother unfit for several other well-supported reasons, including her exposure to and minimization of domestic violence and association with individuals engaged in violence, not seeking adequate mental

10

health support, and not addressing her substance abuse; all of these deficiencies persisted for multiple years.

In arguing the judge abused her discretion, the mother's reliance on Adoption of Theodore, 36 Mass. App. Ct. 355 (1994), is misplaced. In that case, a mother was found unfit to parent her children due to her minimization of the father's abusive behavior against their children and herself. See id. at 356-357. Over one and one-half years after her trial, the mother filed a motion for reconsideration that was supported by an affidavit stating she had divorced her husband and was entirely independent of him. See id. at 357-358. The judge denied the motion without an evidentiary hearing. See id. at 358. On appeal, the court remanded the matter for an evidentiary hearing after concluding that the mother had resolved the single issue supporting her unfitness by divorcing the father and engaging in domestic violence services. See id. at 358-359. Here, in contrast, several issues supported the mother's unfitness, and even after her relocation and successful parenting of a newborn, multiple parental shortcomings remained unresolved. See Adoption of Franklin, 99 Mass. App. Ct. 787, 805 (2021) (motion for relief from judgment denied because "evidence of the [parent]'s unfitness at the time of trial was overwhelming, and the subsequent improvements in [their] situation comparatively

11

modest").  Therefore, the judge did not abuse her discretion in denying the motion.

Decrees affirmed.

Order denying motion for
  relief from judgment and
  for a new trial affirmed.

By the Court (Massing, Hand &
  Smyth, JJ.[5]),

Clerk

Entered:  October 17, 2024.

---

[5] The panelists are listed in order of seniority.