NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-1053

ADOPTION OF IMAR.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

Imar, born in 2011, appeals from so much of a Juvenile Court judge's decree as terminated the father's parental rights. Although Imar does not challenge the finding of unfitness, he argues that the judge abused her discretion by ruling that termination was in his best interests, because (1) the permanency plan submitted by the Department of Children and Families (DCF) was too vague to be accepted; and (2) he does not want to be adopted, is old enough to oppose adoption, and wants to be reunified with the father, who in Imar's view is capable of caring for him.  We affirm the decree.

We clarify at the outset that certain issues arising out of the same Juvenile Court trial are not properly before us. First, the judge also terminated parental rights as to Andrew,

---

[1] A pseudonym.

born in 2009, but he did not timely appeal.  Andrew is nominally an appellee but has filed a brief that, while not challenging the findings of unfitness, argues that it was an abuse of discretion to terminate the father's parental rights.  Second, the father filed a timely notice of appeal but failed to timely docket that appeal.  The father filed a brief that, like those of Imar and Andrew, does not challenge the finding of unfitness but argues that termination of his parental rights was an abuse of discretion.  A single justice denied the father's motion for leave to file that brief late but ordered that the brief be retained for possible consideration by the panel.  We have exercised our discretion to consider the arguments in the briefs filed by Andrew and the father to the extent they are relevant to the relief sought by Imar.[2]

Background.  The judge summarized her reasons for finding the father permanently unfit as follows:

> "[T]he court considered his history of housing instability, his lack of insight into his children's needs and services, his lack of accountability, his self-medication with marijuana, and his lack of measurable gains in parenting ability despite engagement in services.  Finally, the court considers the children's lengthy separation from . . .

---

[2] The judge also issued decrees terminating the mother's parental rights, but she did not appeal, nor has the termination of her rights been challenged by Imar or Andrew or by the father.  Finally, decrees also issued terminating the parents' rights as to the younger sister of Imar and Andrew, but neither she nor either parent appealed, nor do the briefs raise any issue as to her.

[the] [f]ather's care, as well as their growth and progress in placement."

The judge also noted that, although the father sought reunification, "[h]e does not exhibit the capacity to comprehend the needs of his children or the skills to meet them.  It would pose a significant risk to [Imar and Andrew] were the boys to be reunified with him in his home."  Reunification would be "contrary to their best interests."  Both Imar and Andrew "require a great deal of consistency and stability, as well as continuity of services.  [The father] cannot provide this consistency, stability, or continuity."   As already stated, Imar does not argue on appeal that the finding of permanent unfitness was erroneous.

Imar was placed in a comprehensive foster care (CFC) placement in November 2019 and remained there as of the close of the evidence in 2023.  CFC foster parents are "specially trained to provide care for children with behavioral struggles."  The adoption social worker testified that Imar was not ready to "step down" from his CFC placement to an unrestricted foster placement.  His current placement, however, was "not committed to providing him permanency."  Imar wished to be reunified with the father.  Although Imar "has been clear in his refusal to be

3

adopted, [DCF] has maintained this goal due to his age.[3] While the current placement is not permanent, it is the place where [Imar] has been most stable, and bodes well for a future permanent adoptive parent or guardian to commit to [Imar]."

Andrew's situation was similar. As of the close of the evidence, he had been in the same CFC placement since February of 2020, from which he was not ready to step down. He had "made clear that he would prefer to be with his father." "Although [Andrew had] clearly expressed that he does not wish to be adopted and is of the age where his consent is required, he has still been in a stable and caring home that is open to being a guardianship placement."[4]

---

[3] Imar, born in November of 2011, was eleven as of the close of evidence in February 2023, but is now thirteen and thus, under G. L. c. 210, § 2, old enough to veto adoption.

[4] More than one year after the close of the evidence and entry of the decrees, and after Imar's appeal was docketed in this court, Andrew informed us that his placement had disrupted, and he sought leave to file a late notice of appeal of the decree terminating the father's rights to him. A single justice denied his motion, as more than one year had elapsed. See Mass. R. A. P. 14 (b), as appearing in 481 Mass. 1626 (2019). Notwithstanding the posttrial disruption of his placement, we "address the propriety of the judge's orders based on the evidence introduced at trial, and not on posttrial events." Adoption of Willow, 433 Mass. 636, 644 n.8 (2001). Posttermination developments that affect DCF's progress in implementing an adoption or other permanency plan should be addressed at the permanency hearing mandated by G. L. c. 119, § 29B. See Adoption of Nate, 69 Mass. App. Ct. 371, 375 (2007).

DCF's goal for both boys was "permanency through adoption," although DCF planned to pursue guardianships for the boys if available. The judge concluded that DCF's permanency plan, "including the testimony of the social workers, has sufficient content and substance to permit this court the meaningful ability to evaluate what [DCF] proposes to do for these children," and that the "plans are in the best interests of the children."

At the heart of the judge's rationale for why termination of the father's rights was in Imar's and Andrew's best interests was the following:

> "The effect of leaving parental rights intact has had a detrimental effect on the boys' achieving permanency. The court reasons that they will have a better chance of achieving permanency without parental legal ties. Children who are legally freed have a wider pool of pre-adoptive parents willing to consider making a commitment to them. [Imar] in particular has refused to consider -- or even meet -- prospective permanent parents because he holds out hope of reunifying with his father. The court wishes to make it clear to the boys that reunification with their father is not possible. It is time for different caretakers to assume legal responsibility for them. This in no way severs the emotional bond -- or the necessity of contact -- between [the boys] and their father. The court wishes to provide them with opportunity for supportive, stable care that is not available to them were they to return to their father. [He] can and should remain a comforting presence in their lives, but he does not have the capacity to meet their needs."

Further recognizing the importance of the parent-child bond, the judge found that that posttermination and postadoption contact with the father was in the boys' best interests. She ordered

5

"no fewer than four" such contacts annually for each boy, with more frequent contact for Imar until he was moved to a preadoptive home.

Discussion. 1. Permanency plan. In determining the best interests of the child, the judge must consider, among other things, "the plan proposed by the department." G. L. c. 210, § 3 (c). "The law does not require that the adoption plan be fully developed in order to support a termination order, but it must provide sufficient information about the prospective adoptive placement so that the judge may properly evaluate the suitability of the department's proposal" (quotations and citations omitted). Adoption of Varik, 95 Mass. App. Ct. 762, 770 (2019). "In determining the sufficiency of the plan, the judge may consider evidence and testimony presented at trial regarding unfitness and the child's best interests, in addition to the written plan." Id.

Here, DCF's written plan was very sparse, saying little more than that the goal for both boys was adoption. At trial, however, the adoption social worker testified that both Imar and Andrew were in CFC placements from which they were not yet ready to step down. Implicit in this was DCF's view that both boys should be placed with preadoptive parents who, like CFC parents, were specially trained, or at least prepared, to provide care for children with behavioral struggles.

6

The judge also found that both boys "require a great deal of consistency and stability, as well as continuity of services," and, further, "require caretakers who can prioritize their needs, including engagement in numerous specialized services." The judge concluded that DCF should continue to investigate options not only for adoption of Imar but also for a guardianship. DCF was also considering seeking a guardianship for Andrew, who at that time was in a seemingly stable CFC placement with a family open to a guardianship.

The judge concluded that DCF's plan, as supplemented by social worker testimony, gave her "the meaningful ability to evaluate what [DCF] proposes to do for these children," and that DCF's plans were in the boys' best interests. It would certainly be desirable for DCF to submit written plans detailing, or at a minimum to have its social workers prepared to testify in more detail about, the characteristics of the caretakers being sought for a particular child. Cf. Varik, 95 Mass. App. Ct. at 771 (plan inadequate where it "failed to specify the type of adoptive parents and the characteristics of the home environment best suited to meet [child's] specific needs"). But more detail will be required in some cases than in others; Varik did not establish a prescribed level of detail applicable to every case. See Adoption of Xarissa, 99 Mass. App. Ct. 610, 621-622 (2021). That is particularly so where a

7

child's preferences may change after termination. Id. at 622-623. Here we cannot say that the information before the judge about DCF's plans for the boys was so vague as to make her approval of them an abuse of discretion.

2. Termination. Because termination of parental rights is an "extreme step," "[t]he natural bond between parent and child should not be permanently severed unless the child's present or future welfare demands it." Adoption of Carlos, 413 Mass. 339, 350 (1992). Further, before taking this "extreme step," a judge must "articulate specific and detailed findings in support of a conclusion that termination is appropriate, demonstrating that she has given the evidence close attention." Adoption of Nancy, 443 Mass. 512, 514-515 (2005). "We give substantial deference to a judge's decision that termination of a parent's rights is in the best interest of the child, and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Ilona, 459 Mass. 53, 59 (2011). Determining the best interests of the child presents the judge "with a classic example of a discretionary decision." Adoption of a Minor (No. 2), 367 Mass. 684, 688 (1975). "Standards of mathematical precision are neither possible nor desirable in this field; much must be left to the trial judge's experience and judgment" (quotation omitted). Id. The question is not whether we would have made

8

the same decision, but instead whether the judge made a "clear error of judgment in weighing the factors relevant to the decision such that the decision falls outside the range of reasonable alternatives" (quotation and citation omitted).  L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).

Here, the judge's decision identifies two different grounds on which termination will further the boys' best interests.  We consider them in turn.

First, we understand the judge to have concluded that termination of the father's rights is likely to increase the boys' receptiveness to the alternative permanent placements they need.  In that vein, the judge concluded that Imar had "refused to consider -- or even meet -- prospective permanent parents because he holds out hope of reunifying with his father" and, therefore, the judge "wishe[d] to make it clear to the boys that reunification with their father is not possible."  As DCF suggested at oral argument before us, the judge wished to disabuse the boys of false hopes.

We recognize that the judge made no express finding that eliminating such hopes will materially change the boys' willingness to consider other placements.[5]  But it is the rare

---

[5] The judge did not predicate her decision on the likelihood of adoption.  Rather, she was careful to state that she understood and had considered the preferences of both boys not to be adopted:  "Even if adoption is not the ultimate outcome,

9

case in which a judge will have sufficient direct evidence to accurately predict future changes in a child's attitudes and feelings.[6]  Nevertheless, even without such evidence, it stands to reason that termination is more likely to increase a child's receptiveness to alternative placements than to decrease it.  And we owe deference not only to the judge's assessment of credibility and weighing of the conflicting evidence but also to her "experience and judgment" (citation omitted).  Adoption of a Minor (No. 2), 367 Mass. at 688.

Here the judge considered this likely benefit of termination, and she also considered the importance of "the emotional bond -- [and] the necessity of contact -- between [the boys] and their father," who "can and should remain a comforting presence in their lives."  She recognized the importance of that bond by ordering posttermination and postadoption contact.  Thus the judge implicitly concluded that, on balance, the benefit to the boys of increasing their openness to other permanent

_____

severing their legal relationship with their parents serves their best interests, as it frees them to be parented by caretakers who are capable of addressing their needs and providing long term stability."

[6] We note the judge's finding that the father "would also consistently make statements to the children, telling them to contact their lawyers saying they wanted to be reunified, or telling the children to refuse to be put into a new placement if they were moved."

10

placements was likely to outweigh the detriment to them of severing their purely legal bond -- while preserving their emotional bond -- with the father.  We cannot say this was an abuse of discretion.

Second, the judge concluded that termination would likely increase the availability of such other permanent placements.  Thus, the judge reasoned that the boys "will have a better chance of achieving permanency without parental legal ties.  Children who are legally freed have a wider pool of pre-adoptive parents willing to consider making a commitment to them."  Although to date the boys have opposed adoption, the judge was not bound to accept that position as their last word on the subject.  She could consider that their attitudes may change once they know reunification is no longer possible, and that in such circumstances they would benefit from the availability of a greater number of potential adoptive parents.

For these reasons, the judge did not abuse her discretion in terminating the father's parental rights.

Conclusion.  The decree terminating the father's parental rights to Imar is affirmed.

So ordered.

By the Court (Sacks, Englander & Walsh, JJ.[7]),

---

[7] The panelists are listed in order of seniority.

Clerk

Entered:  August 25, 2025.